**FIDELITY PARTNERS, INC., Plaintiff,**

v.

**PHILIPPINE EXPORT AND FOREIGN LOAN GUARANTEE CORPORATION, Defendant.**

**No. 96 CIV. 0407 (AGS).**

United States District Court, S.D. New York.

April 2, 1996.

Robert L. Weigel, Gibson, Dunn & Crutcher, New York City, for plaintiff.

Sutton Keany, Steven R. Schindler, Bradley A. Siciliano, Winthrop, Stimson, Putnam & Roberts, New York City, for defendant.

## ORDER AND OPINION

SCHWARTZ, District Judge.

Plaintiff Fidelity Partners, Inc. ("Fidelity") moves for a post-judgment order of attachment and execution against certain accounts of defendant Philippine Export and Foreign Loan Guarantee Corporation ("Philguarantee") at the Philippine National Bank and the Federal Reserve Bank. For the reasons set forth below, Fidelity's motion is denied.

## BACKGROUND AND FACTS

A. *Background*

Fidelity is the assignee of a Stipulation and Order for Entry of Judgment Under Seal entered against Philguarantee and in favor of Vincente B. Chuidian ("Chuidian") in the Superior Court of the State of California for the County of Santa Clara on December 5, 1985 ("the California Judgment"). *See* Stipulation and Order for Entry of Judgment Under Seal, dated December 17, 1985, attached as Exhibit A to Revised Supplemental Declaration of Robert L. Weigel in Support of Plaintiff's Motion for an Order of Attachment and Execution dated March 4, 1996 ("Rev.Supp. Weigel Dec.").

Philguarantee is an agency of the Philippine government, which was created for the purpose of guaranteeing loans in order to foster economic growth within the Philippines. *Philippine Export And Foreign Loan Guarantee Corp. v. Chuidian*, 218 Cal.App.3d 1058, 267 Cal.Rptr. 457, 460 (1990). In June 1985, Philguarantee commenced an action against Chuidian in the California state courts, alleging that Chuidian had misused loan guarantees obtained from Philguarantee. That action was ultimately settled. The terms were set forth in

a Settlement Agreement and Mutual Release, which was incorporated into the California Judgment.[1]

In April 1986, Philguarantee sought to vacate the California Judgment. The trial court rebuffed Philguarantee's attempt to vacate the stipulated judgment, and the California Court of Appeals upheld the trial court's decision. *See Philippine Export*, 267 Cal.Rptr. at 460, 470. However, the appeals court expressly limited the scope of the trial court's orders in aid of execution. Relying on principles of sovereign immunity and the Foreign Sovereign Immunities Act of 1976 ("FSIA"), the appeals court expressly excluded from execution "Philguarantee's assets located in the Philippines," holding that such assets are "immune from execution." *Id.* 267 Cal.Rptr. at 481. In addition, the Court of Appeals held that the trial court "in aid of execution may order Philguarantee to assign only such assets as Chuidian may legally execute upon in satisfaction of the judgment." As a result, the Court of Appeals held that the trial court's order in aid of execution must be limited to "an order compelling Philguarantee to assign to Chuidian all debts owing or to become owing to Philguarantee from individuals or entities located in the United States." *Id.*

In 1986, further litigation ensued concerning payment under a letter of credit issued by Philippine National Bank ("PNB") in favor of Chuidian in accordance with the California Judgment. After payment under the letter of credit was "frozen" by order of the Philippine government, Chuidian filed suit in federal district court in California to compel payment. The court held that PNB was not required to make further payment to Chuidian under the letter of credit, and the Ninth Circuit affirmed. *Chuidian v. Philippine Nat'l Bank*, 734 F.Supp. 415 (C.D.Cal.1990), *aff'd*, 976 F.2d 561 (9th Cir.1992).

In April 1991, Chuidian filed for bankruptcy. In November 1995, the Chapter 7 trustee of Chuidian's estate sold the California

---

1. The background of the litigation between Chuidian and Philguarantee is recounted in greater detail in several published opinions. *See Philippine Export And Foreign Loan Guarantee Corp. v.* *Chuidian*, 218 Cal.App.3d 1058, 267 Cal.Rptr. 457, 460 (1990), *later proceeding, Chuidian v. Philippine Nat'l Bank*, 734 F.Supp. 415 (C.D.Cal. 1990), *aff'd*, 976 F.2d 561 (9th Cir.1992).

Judgment on an "as is where is" basis to Fidelity. In consideration for the stipulated judgment, Fidelity paid $100 plus a promise to pay 40 percent of the net proceeds collected. *See* Declaration of Randy Michelson dated January 30, 1996 attached as Exhibit F to Affidavit of Bradley A. Siciliano in Opposition to Plaintiff's Motion for an Order of Attachment and Execution dated March 12, 1996 ("Siciliano Aff.").

In December 1995, Fidelity commenced a proceeding against Philguarantee in the Philippines seeking recognition and enforcement of the California Judgment. That proceeding is still pending. In its petition in the Philippines, Fidelity alleged that Philguarantee had no assets in the State of California, and, as a consequence, Fidelity was seeking enforcement in the Philippines. *See* Declaration of Jaime A. Sanchez dated January 30, 1996 ("Sanchez Dec."), Exhibit A at ¶ 14, attached as Exhibit D to Siciliano Aff.

At approximately the same time it commenced the Philippines action, Fidelity also sought to register the California Judgment in New York State Supreme Court for New York County. The Clerk of that court apparently refused to register the California Judgment because its terms were not sufficiently clear. *See* Transcript of Hearing, January 25, 1996 at 26–27. Fidelity then brought a plenary action on the California Judgment in the same court, moving for summary judgment in lieu of complaint pursuant to New York Civil Practice Law and Rules ("CPLR") § 3213 on January 2, 1996. Fidelity's motion was brought on by order to show cause returnable January 22, 1996. That order to show cause contained a temporary restraining order ("TRO") "enjoining Philguarantee from making or suffering any sale, assignment, transfer or interference with any property in which it has an interest." Order to Show Cause and Temporary Restraining Order, attached as Exhibit G to Siciliano Aff.

On January 22, 1996, the date Philguarantee's response to Fidelity's motion was due, Philguarantee removed the action to this Court pursuant to 28 U.S.C. § 1441(d). The Court extended the state court's TRO until the parties could be heard on whether the TRO should remain in effect. After hearing argument on January 25, 1996, the Court extended the TRO until February 5, 1996, and ordered Philguarantee to respond to Fidelity's motion for summary judgment by January 29, 1996.

On February 2, 1996, the Court heard oral argument on Fidelity's summary judgment motion. The Court granted Fidelity's motion, finding no disputed issues of material fact and concluding that the California Judgment was entitled to full faith and credit. *See* Transcript of Hearing, February 2, 1996 at 7–11. The Court also extended the TRO pending further proceedings on plaintiff's further motion for attachment and execution. On February 5, 1996, the Court issued an order directing that judgment be entered in favor of Fidelity in the amount of $8,532,-397.00 plus applicable interest. On February 8, 1996, judgment in the amount of $8,713,-275.20 was entered in favor of Fidelity and against Philguarantee.

On February 6, 1996, Fidelity moved by order to show cause for an extension of the TRO then in effect and for a preliminary injunction enjoining disposition of certain assets. On February 7, 1996, the Court heard oral argument on that order to show cause. At the end of the February 7 hearing, the Court issued a new TRO to remain in effect for 10 days pending a further hearing on Fidelity's application for a preliminary injunction on February 14, 1996. At the conclusion of the February 14 hearing, the Court deferred decision on the preliminary injunction motion, but extended the TRO then in effect. On February 20, 1996, the Court extended the TRO until March 5, 1996.

On February 29, Fidelity moved by order to show cause for an order of attachment and execution against certain bank accounts of Philguarantee, pursuant to the FSIA, 28 U.S.C. § 1610(c), and CPLR §§ 5201, 5222, and 5230, incorporated by Rule 69 of the Federal Rules of Civil Procedure.[2] Phil-

**2.** Fidelity also moved for an order directing Philgurantee to give written permission for PNB's production of documents regarding Philguarantee's accounts. This matter, and all matters re-

guarantee, in papers filed March 12, 1996, opposed Fidelity's motion. The Court has extended the TRO in effect in this action pending the Court's consideration of the instant motion.

### B. *Facts*

In support of its motion, Fidelity has submitted public record information relating to PNB's operations and Philguarantee's accounts at both PNB and the Federal Reserve. PNB, which describes itself as the Philippines' first "global bank," maintains branches in New York and Los Angeles. *See* Polk World Bank Directory (1995–1996 Edition) attached as Exhibit B to Rev.Supp. Weigel Dec. PNB's 1994 annual report discusses the fact that PNB's New York branch is linked to a system allowing money deposited in New York to be immediately withdrawn from automated teller machines located in the Philippines. *See* 1994 PNB Annual Report at 8, attached as Exhibit C to Rev.Supp. Weigel Dec. The report also states that 154 domestic and overseas branches of PNB were "on-line" and that PNB recently upgraded its IBM computer mainframe. *Id.* at 12. Fidelity has also submitted a copy of a 1994 audit report on Philguarantee. *See* Republic of the Phillippines, Commission on Audit's Annual Audit Report on the Philippine Export and Foreign Loan Guarantee Corporation for the Calendar Year 1994, attached as Exhibit D to Rev.Supp. Weigel Dec. The audit report indicates that Philguarantee had substantial amounts on deposit with PNB during 1993 and 1994. According to Fidelity, the report also indicates that Philguarantee had funds on deposit with the Federal Reserve during the same time period. *Id.* at 13–14.

In opposition to Fidelity's motion, Philguarantee submitted the declarations of Jesus M. Tañedo, an executive vice president of Philguarantee, and Pedro E. Reyes, the deputy general manager or PNB's New York branch ("PNB–New York"). Mr. Tañedo states that Philguarantee does not have any assets or bank accounts in the United States, and "does not have any funds or other assets on deposit with the Federal Reserve Bank in

the United States." Declaration of Jesus M. Tañedo dated January 24, 1996 ("Tañedo Dec.") at ¶ 5, attached as Exhibit A to Siciliano Aff.; *see also* Transcript of February 2, 1996 Hearing at 20–22; Transcript of February 14, 1996 Hearing at 16–17. Mr. Tañedo further states that Philguarantee does have an account with "the Philippines National Bank–Manila ("PNB–Manila"), and that this account was "opened in Manila and can only be drawn upon by Philguarantee in Manila." *Id.* at ¶ 6.

Mr. Reyes of PNB states in his declaration that PNB–New York is a branch of PNB, and that "PNB–New York has neither control nor managerial direction over Philippine National Bank, Manila nor over any other branch of Philippine National Bank in the Philippines." Declaration of Pedro E. Reyes III dated March 4, 1996 ("Reyes Dec.") at ¶ 3, attached as Exhibit B to Siciliano Aff. PNB is organized and chartered under the laws of the Philippines. *Id.* Mr. Reyes further states that "Philguarantee does not maintain an account with PNB–New York. PNB–New York does not maintain any records with respect to the existence of an account for Philguarantee at any other branch of Philippine National Bank." *Id.* at ¶ 4. Mr. Reyes also declares that "Philguarantee does not have any right to direct PNB–New York to make any payments to or for the benefit of Philguarantee from PNB–New York." *Id.* at ¶ 5. Finally, Mr. Reyes states that "PNB–New York does not maintain any Automated Teller Machines ("ATM's") or similar devices in New York which can be used by an account holder at any other branch to draw on an account maintained at another branch." *Id.* at ¶ 6.

Both Philguarantee and Fidelity have submitted declarations of Philippine lawyers bearing on certain aspects of Philippine law. As these issues are not relevant to the grounds for the Court's decision, these declarations are not discussed herein.

### DISCUSSION

When this action first came before this Court upon removal from state court, Fideli-

---

lating to discovery, have been referred by the Court to Magistrate Judge Gershon.

ty moved for summary judgment as well as for execution against certain bank accounts of Philguarantee. Although the Court determined that no genuine issue of material fact precluded granting summary judgment, the Court deferred any ruling on Fidelity's motion for execution because such motion was clearly premature under the Federal Rules of Civil Procedure.[3] However, to maintain the status quo pending resolution of Fidelity's motions for execution, the Court has extended the TRO restraining Philguarantee's assets pending resolution of Fidelity's motion. Now that judgment has been entered and the record with respect to the accounts at issue more fully developed, Fidelity seeks an order of attachment and execution against any accounts maintained by Philguarantee at PNB and the Federal Reserve.

### A. Accounts at PNB

With respect to any accounts maintained by Philguarantee at PNB, Fidelity's argument for attachment and execution presents a novel theory which was apparently never presented to the California state or federal courts during the years of litigation between Philguarantee and Chuidian. Fidelity's argument proceeds as follows: (1) the California Court of Appeals held that Fidelity is entitled to execute against "all debts owing or to become owing to Philguarantee from individuals or entities located in the United States"; (2) a bank account is a debt, and PNB is thus a debtor of Philguarantee; and (3) PNB is "located" in the United States because it maintains an office in New York and does business in New York.[4] Thus, Fidelity concludes, it may levy upon Philguarantee's accounts at PNB to satisfy the judgment entered against Philguarantee.

The Court rejects Fidelity's novel argument for two reasons. First, Fidelity's theory does not comport with well-recognized principles of foreign sovereign immunity. Second, Fidelity's theory violates New York state law regarding jurisdictional limitations on attachment and execution.[5]

### 1. Foreign Sovereign Immunity

■ Here, as in the prior litigation, no party contests Philguarantee's status as an "agency or instrumentality of a foreign state" under the FSIA. See 28 U.S.C. § 1603(a), (b); *Philippine Export*, 267 Cal.Rptr. at 476. As the language of the statute makes plain, the FSIA does not create immunities, but rather creates exceptions to pre-existing immunities. Before enactment of the FSIA in 1976, the traditional view of courts in the United States was that property of foreign states was absolutely immune from execution. See H.R.Rep. No. 1487, 94th Cong., 2d Sess. 27, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6626 (citing *Dexter & Carpenter, Inc. v. Kunglig Jarnvagsstyrelsen*, 43 F.2d 705 (2d Cir.1930), *cert. denied*, 282 U.S. 896, 51 S.Ct. 181, 75 L.Ed. 789 (1931)); *cf. Philippine Export*, 267 Cal.Rptr. at 477 (before enactment of the FSIA, law prescribed "absolute immunity from execution upon assets of a foreign state outside the United States"). The exceptions created by the FSIA to immunity from execution are contained in Sec-

---

**3.** Rule 62(a) states in relevant part that "no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry."

**4.** Philguarantee notes an inconsistency in Fidelity's position in this action and its position in the pending action in the Philippines. Plaintiff argued in its petition in the Philippines that it seeks judgment there because Philguarantee has no property in California. Sanchez Dec., Exhibit A at ¶ 14. However, if Philguarantee has no assets in California—notwithstanding the existence of PNB's Los Angeles branch—then by the same reasoning, Philguarantee has no assets in New York because PNB has a branch here. In addition, assuming Philguarantee maintained accounts at PNB in 1985, Fidelity's position in this litigation also appears inconsistent with the po-

sition previously taken by Chuidian, Fidelity's predecessor-in-interest, who "concedes Philguarantee has no assets in the United States." *Philippine Export*, 267 Cal.Rptr. at 476.

**5.** Philguarantee also argues that an order of execution in this case would violate the Act of State doctrine and principles of international comity, contending that Philguarantee is prohibited from paying on the California Judgment by specific governmental decree and that payment from PNB–Manila to Fidelity would violate Philippine currency export laws. Fidelity argues that the Act of State doctrine and Philippine currency laws do not prevent the issuance of an order of execution. However, in view of the Court's decision as set forth below, the Court does not reach the applicability of the Act of State doctrine and related issues of Philippine law.

tions 1610 and 1611. Section 1610, the only arguably relevant provision, "speaks only of a foreign state's property in the United States. Accordingly the statute creates no exception to immunity for property outside the United States." *Philippine Export,* 267 Cal.Rptr. at 477.

Although the prior litigation between Philguarantee and Fidelity's predecessor established that "Philguarantee's assets located in the Philippines are immune from execution," *id.* 267 Cal.Rptr. at 481, the California courts apparently were never called upon to decide the issue before this Court: whether this immunity from execution applies to Philguarantee's accounts at PNB. Philguarantee contends that its accounts with PNB are assets "located in the Philippines" and thus immune from execution. Fidelity, on the other hand, contends these accounts are properly viewed as debts owing to Philguarantee from a debtor located in the United States, and thus not immune from execution.

Instead of characterizing the PNB accounts as Philguarantee's asset, Fidelity views these accounts as PNB's debt owed to Philguarantee. By characterizing the accounts as PNB's debt rather than as Philguarantee's assets, Fidelity apparently believes it can avoid an analysis of the location of the accounts under the principles of sovereign immunity discussed above. However, the weakness in Fidelity's argument is that any right to execute on debts owing to Philguarantee from debtors located in the United States is but the flip side of Fidelity's right to execute on Philguarantee's assets in the United States.[6] Fidelity cannot gain "additional" rights merely by characterizing the

same bank accounts as a "debt" rather than as an "asset."

Because a bank account is always the depositor's asset as well as the bank's debt, Fidelity's motion for execution upon PNB's "debt" must also be viewed as a motion for execution upon Philguarantee's "asset." Execution must still be squared with the long-standing principle that a foreign state's assets outside the United States are absolutely immune from execution to satisfy judgments entered in United States courts; a judgment creditor "must rely on principles of comity in the foreign state to have his judgment enforced there." *Philippine Export,* 267 Cal. Rptr. at 477.

 The language of the FSIA reinforces the conclusion that the exception from immunity set forth in the statute is a limited one. Section 1610(b) of the FSIA provides in relevant part as follows:

> [A]ny property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or a state after the effective date of this Act, if [either one of two conditions is met].

Any analysis of the statute must begin with an examination of the plain meaning of its language.[7] The language of Section 1610(b) makes clear that the statute only provides a limited exception from the general immunity from attachment and execution historically accorded to foreign states. The statute permits attachment and execution with respect to certain property that *"is in the United*

---

**6.** The California Court of Appeals implicitly recognized this when it modified the trial court's order compelling Philguarantee to assign to Chuidian all debts owing to it, holding that the order was too broad because "it is not restricted to debtors who reside in the United States." *Philippine Export,* 267 Cal.Rptr. at 481. The appeals court held that the trial court "may order Philguarantee to assign *only such assets as Chuidian may legally execute upon in satisfaction of the judgment."* *Id.* 267 Cal.Rptr. at 481 (emphasis added).

**7.** "It is axiomatic that '[t]he starting point in every case involving construction of a statute is

the language itself.'" *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985) (citation omitted). "The plain meaning of the statute's language should control except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Samuels, Kramer & Co. v. Comm'r of Internal Revenue,* 930 F.2d 975, 979 (2d Cir.) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)), *cert. denied,* 502 U.S. 957, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991).

*States.*" Section 1610(b) does not extend that exception to property located *outside* of the United States. *Philippine Export,* 267 Cal.Rptr. at 477; *Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1477 (9th Cir.1992) ("[S]ection 1610 does not empower United States courts to levy on assets located outside the United States."), *cert. dismissed,* 506 U.S. 948, 113 S.Ct. 454, 121 L.Ed.2d 325 (1992). Under the FSIA, assets of foreign states located outside the United States retain their traditional immunity from execution to satisfy judgments entered in United States courts.

■ Thus, it appears necessary under the FSIA to ascribe a location, or situs, to the PNB accounts. In other contexts, it has been recognized that the situs of intangible assets "is in truth a legal fiction," but that "there are times when justice or convenience requires that a legal situs be ascribed to them." *Severnoe Secs. Corp. v. London & Lancashire Inc.,* 255 N.Y. 120, 123, 174 N.E. 299, 300 (1931) (Cardozo, J.). This case presents such a time. Whether the PNB accounts are characterized as "debts" of PNB or as "assets" of Philguarantee, a determination of the situs of the accounts is necessary to preserve the limited reach of the FSIA's exceptions to immunity.[8] This is especially important in the instant case, where Fidelity seeks to levy upon a foreign state's bank deposits maintained at a bank headquartered in its own country. An analysis of Philguarantee's banking relationship with PNB compels the conclusion that the situs of Philguarantee's PNB accounts is in Manila, not "in the United States" as Section 1610(b) of the FSIA requires. Philguarantee has presented uncontroverted evidence that (1) its account with PNB is maintained by PNB's Manila office; (2) PNB's New York branch does not maintain any records with respect to accounts at other branches; and (3) Philguarantee has no right to direct PNB's New York branch to make any payments to or for the benefit of Philguarantee from PNB's New York branch. These facts lead the Court to conclude, at least for the purposes of foreign sovereign immunity, that the disputed PNB

accounts are located in Manila, not in the United States. Accordingly, the Court holds that principles of foreign sovereign immunity prohibit attachment and execution against Philguarantee's accounts at PNB.

### 2. *Applicable State Law*

Fidelity is also prohibited from levying on Philguarantee's accounts at PNB under New York law and well-established principles regarding attachments and executions against bank accounts.

■ Fidelity has cited no authority supporting its rather extraordinary proposition that a sheriff or marshal serving an execution under CPLR § 5232 in New York can levy upon deposits in a bank account in another jurisdiction. To the contrary, it has been held by courts throughout the country that "accounts or deposits may be seized only by serving the writ at the branch, or the main office, supposedly holding the funds for the debtor." Annotation, *Attachment and Garnishment of Funds in Branch Bank or Main Office of Bank Having Branches,* 12 A.L.R.3d 1088, 1089 (1967). This rule of law, known as the "separate entity" rule, provides that "each branch of a bank is a separate entity, [and is] in no way concerned with accounts maintained by depositors in other branches or at a home office." *Cronan v. Schilling,* 100 N.Y.S.2d 474, 476 (Sup.Ct. N.Y.Co.1950), *aff'd,* 282 App.Div. 940, 126 N.Y.S.2d 192 (1st Dep't 1953) (citations omitted). Philguarantee argues persuasively that the separate entity rule prohibits Fidelity's attempt to execute against assets held in PNB's Manila office by moving against the bank's local branch; the Court agrees that the New York branch and the Manila office should be viewed as separate entities for the purposes of attachment and execution.

The Court recognizes, however, that some limitations have been placed on the separate entity rule in recent years due to advances in computer and communications technology and the accompanying centralization of functions at the main offices of large banks. For

8. Fidelity points to no authority directly supporting its argument that it can avoid an analysis of the situs of the PNB accounts pursuant to the

FSIA simply by characterizing them as a *debt* owed by an entity "located" in the United States.

example, this Court has held that where bank branches within the same jurisdiction are connected to the main office by high-speed computers and are under the control of the main office, a restraining notice may validly be served on the main office of a bank in order to effectively reach accounts maintained at the bank's branches. *Digitrex, Inc. v. Johnson*, 491 F.Supp. 66 (S.D.N.Y.1980). New York decisions since *Digitrex* have determined the validity of the service of restraining notices and subpoenas "on a case by case basis in relation to a bank's existing computer operations and the burden imposed by compliance." *Carrick Realty Corp. v. Flores*, 157 Misc.2d 868, 598 N.Y.S.2d 903, 907 (Civ.Ct.City of N.Y.1993); *see also Therm–X–Chemical & Oil Corp. v. Extebank*, 84 A.D.2d 787, 444 N.Y.S.2d 26 (2d Dep't 1981).

However, *Digitrex* and its progeny are inapposite here because the circumstances of this case are very different from the facts of *Digitrex*.[9] Fidelity is not simply seeking to reach funds maintained at a branch within this jurisdiction by serving the main office within this jurisdiction. Rather, Fidelity seeks to reach funds at PNB's headquarters in Manila—on the opposite end of the globe and in another sovereign nation. As discussed above, Philguarantee has presented evidence that PNB's New York branch has neither control nor managerial direction over PNB's Manila main office, and that Philguarantee has no right or entitlement to draw on its account at PNB's New York branch. Furthermore, PNB's New York branch maintains no records regarding any accounts that Philguarantee has in Manila. Reyes Dec. at ¶¶ 3–5. These facts demonstrate that PNB's New York branch and its Manila main office should be considered separate entities for the purposes of attachment and execution. Thus, the rationale for the decision to

abrogate the separate entity rule in *Digitrex* does not apply to this case.

Although Fidelity argues that nothing more than a valid money judgment is necessary for the issuance of a restraining order and an order of execution, the law in fact does require more: it requires that the property sought to be levied against exist within the jurisdiction. *Intercontinental Credit Corp. Div. of Pan American Trade Dev. Corp. v. Roth*, 152 Misc.2d 751, 578 N.Y.S.2d 955, 956 (Sup.Ct.N.Y.Co.1990) (in case involving bank deposits held in Israel, court held that "a New York court cannot attach property not within its jurisdiction," citing *McCloskey v. Chase Manhattan Bank*, 11 N.Y.2d 936, 228 N.Y.S.2d 825, 183 N.E.2d 227 (1962)), *vacated on other grounds*, 154 Misc.2d 639, 595 N.Y.S.2d 602 (Sup.Ct. N.Y.Co.1991); *Gavilanes v. Matavosian*, 123 Misc.2d 868, 475 N.Y.S.2d 987, 989 (Civ.Ct. Queens Co.1984); 6 Weinstein, Korn & Miller, New York Civil Practice ¶ 5202.08 (1995) (property must be located within territorial jurisdiction of sheriff to be executed upon). *See also Newtown Jackson Co. v. Animashaun*, 148 N.Y.S.2d 66 (Sup.Ct.Nassau Co.1955) ("situs of the debt is at the branch where the account is carried"); 7 C.J.S. Attachment § 65 (1980) ("the court cannot attach property which is not within the territorial limits of its jurisdiction"). Where, as here, "the balance on an account is maintained ... at a branch in a foreign jurisdiction, it is not subject to attachment in New York." *Gavilanes*, 475 N.Y.S.2d at 990. For example, the court in *Intercontinental Credit Corp.* held that a restraining notice served on the New York agency of an Israeli bank did not restrain assets of the judgment debtor held by the bank in Israel. 578 N.Y.S.2d at 956, 959. Similarly, Fidelity may not obtain an order of attachment or execution from a New York court against Philguarantee's ac-

---

**9.** Fidelity also places great reliance on *Wells Fargo Asia Ltd. v. Citibank, N.A.*, 936 F.2d 723 (2d Cir.1991), *cert. denied*, 505 U.S. 1204, 112 S.Ct. 2990, 120 L.Ed.2d 868 (1992), arguing that it represents the Second Circuit's implicit rejection of the "separate entity" rule. However, *Wells Fargo* simply holds that depositors at foreign branches of United States banks may, in certain circumstances, bring actions here against the bank to collect their deposits if the bank's

foreign branch refuses to honor the deposits. *Wells Fargo* did not have anything to do with the execution or attachment of assets by a third party. In addition, the plaintiff in *Wells Fargo* sought payment from the main office of a bank on funds maintained at a branch office. Here, Fidelity seeks to reach funds at the main office by levying on a branch office which has no control over the main office.

counts at PNB, which are maintained at PNB's Manila office.

## B. *Accounts at the Federal Reserve*

With regard to Fidelity's motion for attachment and execution on any accounts at the Federal Reserve, Philguarantee has presented affirmative evidence that it does not have any assets on deposit with that institution. *See* Tañedo Dec. at ¶ 5. Fidelity has offered no persuasive evidence to the contrary. Rather, Fidelity's contention that Philguarantee is the owner of deposits at the Federal Reserve appears to be based entirely on a somewhat unclear footnote to the 1994 audit report of Philguarantee. Philguarantee has represented to the Court that the footnote refers to securities at the Federal Reserve which are owned by the Government of the Republic of the Philippines, not by Philguarantee, and are pledged to secure obligations of the Philippine government. *See* Transcript of February 2, 1996 Hearing at 20–22; Transcript of February 14, 1996 Hearing at 16–17. Accordingly, Fidelity's motion for an order of attachment and execution with respect to any accounts at the Federal Reserve is denied.

## CONCLUSION

For the reasons set forth above, Fidelity's motion for attachment and execution is denied. The TRO in effect in this action shall terminate upon its expiration on April 3, 1996 at 5:00 p.m.

SO ORDERED.