**LIMONIUM MARITIME, S.A., Plaintiff,**

v.

**MIZUSHIMA MARINERA, S.A.,
et al., Defendants.**

No. 96 Civ. 1888 (DC).

United States District Court,
S.D. New York.

April 15, 1997.

Keane & Marlowe by Mary Ann C. Marlowe, Christopher P. Keane, East Brunswick, NJ, for Plaintiff Limonium Maritime, S.A.

Freehill, Hogan & Mahar by Peter J. Gutowski, New York City, Watson, Farley & Williams by Alfred E. Yudes, Jr., New York City, for Defendant Mizushima Marinera, S.A.

## OPINION

CHIN, District Judge.

Defendant Mizushima Marinera, S.A. ("Mizushima") moves for an order: (1) vacating the Writs of Maritime Attachment issued under Supplemental Rule B; (2) quashing subpoenas served on four garnishees; and (3) staying this action pending arbitration between plaintiff Limonium Maritime, S.A. ("Limonium") and Mizushima in accordance with a decision of the United States District Court for the District of New Jersey (Walls, J.).

Limonium cross-moves for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) and New York Civ. Prac. L. & R. §§ 6301 and 7502:(1) prohibiting the transfer of certain assets, representing the proceeds of the business activities of the vessel M/V GOLDEN MIZUSHIMA, that are in the possession, custody and/or control of Mizushima and/or Peter Lygnos, George Lygnos, Lygnos

Brothers Shipping Inc., or various affiliated companies; (2) compelling the tender of such proceeds into the registry of the court; (3) prohibiting the transfer of any other assets of Mizushima to the extent necessary to satisfy an award or judgment in this matter; and (4) compelling the tender of assets sufficient to satisfy an award or judgment in this matter into the registry of the Court.

For the reasons stated below: (1) Mizushima's motion to vacate the writs of maritime attachment is granted; (2) Mizushima's motion to quash the subpoenas served upon the garnishees is granted; (3) Mizushima's motion to compel Limonium to arbitrate is granted; and (4) Limonium's cross-motion for a preliminary injunction is denied.

## BACKGROUND

### A. The Facts

■ Pursuant to a bareboat charter agreement[1] dated September 19, 1984 (the "Charter"), Limonium chartered its vessel, the M/V GOLDEN MIZUSHIMA, to Mizushima for a period of twelve years, with semi-annual hire payments due from Mizushima to Limonium. Also on September 19, 1984, in conjunction with the execution of the Charter, Peter Lygnos[2] executed a guarantee, which Limonium claims covers all amounts due under the Charter. Notably, the Charter contains an arbitration clause that provides:

> Any and all differences and disputes between the partie[s] of whatsoever nature arising out of or relating to this Agreement (other than in respect of an action by the Owner for possession of the vessel) shall be referred to arbitration. In any such arbitration the law of New York shall govern as to all matters of substance and procedure, and the parties hereby consent to the jurisdiction of the federal and state courts of New York for purposes of enforcement hereof and of any arbitral award. Any such arbitration shall take

---

1. A bareboat charter (or charter agreement) refers to a "document under which one who charters or leases a boat [in this case, Mizushima] becomes for the period of the charter the owner for all practical purposes." *Black's Law Dictionary* 149 (6th ed.1990).

2. Peter Lygnos and his brother George Lygnos own and operate Lygnos Brothers Shipping, Inc., as well as a series of vessels and management companies, including the vessel at issue in this case.

place in the City of New York unless the parties in a particular case should mutually otherwise agree...

(Charter, Art. 31).

In March 1996, Mizushima redelivered the vessel to Limonium. According to Limonium, over the course of the charter period, Mizushima made untimely payments, defaulted in whole or in part on the twelfth through twenty-first installments, and wrongfully retained certain insurance return premiums and other proceeds belonging to Limonium, all in breach of the Charter. Mizushima, on the other hand, asserts that any claims by Limonium are belatedly asserted and in any event are properly raised only in an arbitration. Mizushima further charges that Limonium instituted the instant action, filed its Rule B attachment, and served overbroad subpoenas on the garnishees, all for the improper purpose of obtaining discovery against the eighty-two alleged alter ego defendants in the instant case.

## B. The New Jersey Action

On August 10, 1995, Limonium and its parent Nissho Iwai Corporation ("NIC") filed a summons and complaint in the United States District Court for the District of New Jersey against Mizushima, Peter Lygnos, George Lygnos, and twenty-nine companies allegedly associated with the Lygnos fleet of vessels. Limonium and NIC set forth four causes of action: (1) breach of contract; (2) breach of guaranty; (3) promissory estoppel; (4) and unjust enrichment. Limonium and NIC sought to adjudicate their claims against all the defendants and to obtain a judgment in the amount of unpaid charter hire (i.e., payments due to Limonium under the Charter) plus interest, costs and attorneys' fees.

On September 20, 1995, defendants in the New Jersey action moved to quash service of process pursuant to Fed.R.Civ.P. 4 and to dismiss the complaint on various grounds pursuant to Fed.R.Civ.P. 12(b). Defendants also sought a stay or dismissal under the Federal Arbitration Act, 9 U.S.C. § 3.

On December 11, 1995 Judge Walls conducted a hearing on defendants' motion to dismiss. During that hearing, Judge Walls dismissed the matter without prejudice and directed Mizushima and NIC to arbitration in New York pursuant to *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), and *Sea–Land Serv., Inc. v. Sea–Land of Puerto Rico, Inc.,* 636 F.Supp. 750 (D.P.R. 1986). Judge Walls expressly stated that he was not deciding whether the alter ego claims could be arbitrated.

Then, on April 23, 1996, Judge Walls issued an Opinion in connection with the same motion and hearing wherein he held that: (1) the defendants' motion to dismiss the action against Peter Lygnos under Rule 12(b)(1) for lack of subject matter jurisdiction was denied; (2) the claims against Mizushima were to be arbitrated pursuant to the charter, and those claims were thus dismissed without prejudice; (3) Peter Lygnos as guarantor could not be compelled to arbitrate with Mizushima; (4) because none of the defendants except Mizushima had clearly agreed that the claims against them should be arbitrated, the arbitrability of such claims can be independently examined by a federal court; and (5) he need not decide the alter ego issue, and dismissed the claims against the other 31 defendants without prejudice. *Nissho Iwai Corp. v. Mizushima Marinera S.A.,* No. 95–3771 (D. N.J. April 23, 1996).

## C. The New York Action

On March 15, 1996, Limonium filed the instant suit in this Court against Mizushima, seeking, *inter alia,* a writ of attachment in accordance with Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. On that same date, I issued an order for process of maritime attachment and garnishment pursuant to Rule B in the amount of $25,682,530.96 or 2,708,736,541 yen. Limonium specifically sought to attach any goods, chattels, property, credits and effects belonging to Mizushima located at (1) The Royal Bank of Scotland; (2) The Bank of New York; (3) Rollins Hudig Hall, of New York, Inc. (an insurance brokerage firm); and (4) Lopez, Edwards, Frank & Co. LLP., Certified Public Accountants.

The law firm of Watson, Farley & Williams appeared on behalf of Mizushima on March 18, 1996. Then, by letter from counsel dated March 22, 1996, Limonium demanded that Mizushima, Peter Lygnos, and fifty-two of Mizushima's "affiliated companies" arbitrate the disputes underlying this action. Mizushima has taken the position that the Lygnos's various affiliated companies are not signatories to the Charter and therefore are not properly parties to the arbitration.

On April 3, 1996, Limonium amended its complaint. In addition to the claims against Mizushima, the amended complaint seeks to impose liability upon Peter Lygnos for breach of a personal guarantee of obligations due Limonium under the Charter, and to impose alter ego liability against Peter Lygnos, George Lygnos, and eighty additional corporate defendants, all affiliated companies of the Lygnos fleet of vessels.

### D. Responses To The Writs Of Attachment

Three of the four garnishees served with the writ of attachment, the Bank of New York, Rollins Hudig Hall, and Lopez, Edwards, Frank & Co. LLP, responded that they were not in possession, custody or control of assets belonging to Mizushima or Lygnos Brothers Shipping, Inc. (*See* Gutowski Aff. Exs. 10–12).[3] Limonium does not challenge the responses of these three garnishees.

Limonium served the writ of attachment on the Royal Bank of Scotland ("RBS") by serving the writ on RBS's New York branch office ("RBS/New York"). Limonium sought to attach any assets of Mizushima at the Royal Bank of Scotland, Shipping Business Centre, London, England ("RBS/London"), as well as at RBS/New York. The Royal Bank of Scotland, however, responded that

"RBS does not have custody or control of any funds, accounts, letters of credit, securities or other property in the name of or belonging to Mizushima Marinera, S.A. or Lygnos Brothers Shipping, Inc. *in the Southern District of New York.*" (*See* Gutowski Aff. Ex. 9) (emphasis added). Limonium and Mizushima dispute whether RBS's response addresses the full reach of the writ of attachment, or whether assets held by RBS outside the district (e.g., in RBS's London branch office) are reached.

In opposition to Mizushima's motion to vacate, Limonium has submitted public information relating to RBS's operations. Limonium obtained such materials by searching the Internet for information about RBS, and by downloading certain excerpts from RBS's homepage, located at www.royalbank-scot.co.uk. (*See* Keane Aff. Exs. 10–14). This information includes a description of telephone banking services available to RBS's offshore banking customers through its International Offshore Banking Division, including the ability to "[c]heck their balance on all their accounts including ... foreign accounts," as well as the ability to "[t]ransfer money between Royal Bank of Scotland International accounts." (*Id.* Exs. 10–12). Also included is a description of IBOS Cross–Border Banking, allowing RBS customers "real-time access to accounts held overseas at banks in the IBOS network." (*Id.* Ex. 13).[4] Next, Limonium documents RBS's receipt of an award for Electronic Data Interchange excellence. (*Id.* Ex. 14). Finally, Limonium provides evidence of the size and income of RBS. (*Id.* Exs. 15–18).

In support of its motion to vacate, Mizushima submitted the affidavit of George B. Freehill, Esq., counsel for Mizushima, and the declarations of Derek Bonnar, a vice president of RBS/New York, and Stavros

---

3. In addition, the garnishees have declined to produce documents called for relating to Mizushima's assets, pending this Court's decision on this motion to vacate the attachments.

4. There is no evidence in the record indicating whether Mizushima could avail itself of RBS's telephone banking and offshore banking services, since it appears that RBS customers must have a "premium Account—a high interest paying cheque account linked to the London Money Mar-

kets" in order to access these services. As Stavros Lagas, the President of Mizushima explains in his declaration, Mizushima generally did not utilize its freight account as a checking account to pay regular bills and expenses, but rather would transfer funds from the freight account to the account of its manager or agent, who in turn would pay such bills and expenses. (Lagas Decl. ¶¶ 6–10).

Lagas, President of defendant Mizushima. Freehill's affidavit sets forth the efforts of counsel for the parties to provide Limonium security by placing funds of Mizushima in escrow, without need for the motion practice presently before me. (Freehill Aff. ¶¶ 2–12). Bonnar, who worked in RBS's London branch prior to his current station in RBS's New York office, states that "RBS London and RBS New York are operated as two separate entities." (Bonnar Decl. ¶ 4). Bonnar further states:

> RBS New York does not have access by computer to information concerning accounts at RBS London. RBS London and RBS New York maintain separate computer systems in London and New York to keep track of deposits only in London or New York respectively. RBS New York does cannot [sic] monitor accounts in London.

> If a depositor of RBS London wishes to withdraw funds from a London account from RBS New York, the funds must be wired by "SWIFT" or another wire service from London to New York, just as it would between two wholly unrelated banks.

(*Id.* ¶¶ 5–6).

Lagas declares that for the past six to seven years, Mizushima has maintained a "freight" account at RBS/London into which freight or charter hire is paid, but which is not used as a "checking account" from which to pay daily operational bills and expenses. (Lagas Decl. ¶¶ 6–8). In addition, Lagas explains Mizushima's banking practices, including certain transfers of funds and remittances of payments that have mistakenly taken place during the pendency of this case, at which time Mizushima had agreed not to transfer its funds, subject to certain exceptions. (*Id.* ¶¶ 8–20). Lagas states that since the onset of litigation, Mizushima has not altered its handling of funds or in any way dissipated its assets. (*Id.* ¶ 25).

## DISCUSSION

### A. *Mizushima's Motion To Vacate The Rule B Attachments*

Supplemental Rule B provides, in pertinent part:

> With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process to the amount sued for, if the defendants shall not be found in the district.

Fed.R.Civ.P. Supp. Rule B(1).

■ Through attachment of a defendant's property in the district, a maritime or admiralty court gains jurisdiction over the defendant's "person," and the plaintiff can gain a judgment against the defendant up to the value of the property attached. *See Robinson v. O.F. Shearer & Sons, Inc.,* 429 F.2d 83, 86 (3d Cir.1970); *Engineering Equip. Co. v. S.S. Selene,* 446 F.Supp. 706, 709 & n. 9 (S.D.N.Y.1978). The rule is a formal recognition of the common law principle that attachment of a defendant's property was often the only way to gain jurisdiction over an admiralty or maritime defendant. *See* 7A Moore's Federal Practice ¶ B.02; *see also East Asiatic Co. v. Indomar, Ltd.,* 422 F.Supp. 1335, 1338 (S.D.N.Y.1976) (recognizing Rule's common law origins). The rule has a twofold purpose: to obtain jurisdiction over the defendant and to obtain security for any judgment awarded. *See VTT Vulcan Petroleum, S.A. v. Langham–Hill Petroleum, Inc.,* 684 F.Supp. 389, 390 (S.D.N.Y. 1988) (citing *Seawind Compania, S.A. v. Crescent Line, Inc.,* 320 F.2d 580, 581–82 (2d Cir.1963)); *East Asiatic,* 422 F.Supp. at 1338. Because jurisdiction over the person is gained only through the attached property, courts have recognized that Rule B jurisdiction properly is characterized as quasi in rem. *See Trans–Asiatic Oil Ltd., S.A. v. Apex Oil Co.,* 804 F.2d 773, 778 (1st Cir.1986) (citing cases); *Maryland Tuna Corp. v. MS Benares,* 429 F.2d 307, 311 (2d Cir.1970) (Rule B attachment is quasi in rem proceeding); *Engineering Equip.,* 446 F.Supp. at 709 n. 9.

■ To be entitled to Rule B attachment, and to establish jurisdiction over the defendant through such attachment, the plaintiff must show, first, that a claim exists against the defendant within the admiralty jurisdic-

tion and, second, that the defendant is not "found within the district." *See* Fed.R.Civ.P. Supp. Rule B(1). The second requirement, the lack of presence within the district, itself has two components: Rule B attachment is inappropriate if the defendant is both within the district in a jurisdictional sense and amenable to service of process within the district. Only if the defendant is not found within the district in either these two senses is attachment appropriate. *See Verton Navigation, Inc. v. Caribica Shipping Ltd.,* No. *90* Civ. 6940(JFK), 1991 WL 24388, at *2 (S.D.N.Y. Feb.20, 1991) (citing *Seawind,* 320 F.2d at 582); *Metal Transport Corp. v. Account No. 232-2-405842 at Chase Manhattan Bank, N.A.,* No. 89 Civ. 8505(JFK), 1990 WL 103987, at *1 (S.D.N.Y. July 16, 1990); *VTT Vulcan Petroleum,* 684 F.Supp. at 390; *East Asiatic,* 422 F.Supp. at 1339. As I previously found, Limonium has met these first two requirements necessary to establish Rule B jurisdiction.

As to the first requirement, defendants do not dispute that Limonium's claims fall within my admiralty jurisdiction, and it is plain that such jurisdiction lies under 28 U.S.C. § 1333. As to the second requirement, counsel for Limonium submitted an Affidavit of Due Diligence Pursuant to Rule B(1) of the Supplemental Rules setting forth Mizushima's lack of presence within the district. Defendants do not dispute their lack ·of "presence" within the district at the time the writs were served.

The only controversy involves the final, and most basic, requirement to Rule B attachment—the location of any property of Mizushima in this district to attach. Mizushima argues that the writs of attachment are void and should be vacated since each of the four garnishees has confirmed that it held no property of Mizushima in this district. (*See* Miz. Mem. at 10–12, citing Gutowski Aff. Exs. 9–12). Mizushima argues that Limonium's Rule B attachment had no extraterritorial effect, so that service of a writ of attachment on RBS/New York is insufficient to reach funds maintained in an account at RBS/London. (Miz. Reply Mem. at 2–22).

Limonium, on the other hand, argues in its memorandum in opposition that the service of a writ of attachment on RBS/New York reaches all assets of Mizushima held by RBS in its main office in London or in any other extraterritorial branches, regardless of the "particular situs" of Mizushima's account. (Lim. Mem. at 24). In reaching this conclusion, Limonium argues that the separate entity doctrine, which holds that each branch of a bank is treated as a separate entity for attachment purposes, was severely abrogated by *Digitrex, Inc. v. J. Howard Johnson,* 491 F.Supp. 66 (S.D.N.Y.1980), which held that service of a restraining notice on Manufacturers Hanover's main office was sufficient to reach assets in the bank's branch office within the same jurisdiction.

Limonium argues that under the case by case approach applied by courts following *Digitrex,* the *Digitrex* doctrine is inapplicable here because RBS has advanced, centralized computer technology and affords Mizushima access to their London account funds in New York. (Lim. Mem. at 28–37). Limonium emphasizes RBS's status as a leading global financial institution, and its reported annual income of $3,400,000,000, in concluding that "it is inconceivable that the *Digitrex* rationale would not apply herein." (*Id.* at 26). In its reply brief, Limonium goes on to argue that after the abrogation of the traditional rule in *Digitrex,* Rule B does not require that the property to be attached be physically present within the district, but that only the debtor must be present within the district. (Lim. Reply Mem. at 7–8). Limonium's argument literally goes too far.

As Judge Preska recently made clear: The caselaw, the authorities, and basic logic demonstrate that no quasi in rem jurisdiction under Rule B can exist without some res to be attached. In fact, for Rule B attachment to be appropriate, it is clear that *the property must be located within the district* and the property must belong to the defendant. *See Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.,* 341 F.2d 50, 53–54 (2d Cir.1965) (property attached in Eastern District of New York did not provide jurisdiction over defendant in the Southern District); *Metal Transport Corp. v. Account No. 232-2-405842 at Chase Manhattan Bank,* No. 89

Civ. 8505(JFK), 1990 WL 55687 (S.D.N.Y. April 26, 1990) "Where the order of attachment is left with a third-party garnishee . . ., the levy is absolutely void unless the garnishee has some property belonging to the defendant or owes the defendant a debt at the time the order is left with him." (quoting *Reibor Int'l Ltd. v. Cargo Carriers (KACZ–CO) Ltd.*, 759 F.2d 262, 266 (2d Cir., 1985)); *International Marine Consultants, Inc. v. Karavias*, No. 82 Civ. 8296(CMM), 1985 WL 1515, at *3–4 (S.D.N.Y. June 3, 1985) (property must belong to defendant and plaintiff has burden of proving ownership); *Reibor International Ltd. v. Cargo Carriers (Kacz–Co.), Ltd.*, No. 83 Civ. 793(CES), 1984 WL 1467, at *1–2 (S.D.N.Y. July 24, 1984) "[T]he goods or credits sought to be attached must be presently within the district." (citing 7A Moore's Federal Practice ¶ B.03, at B–101 (2d ed.1982)), aff'd, 759 F.2d 262 (2d Cir.1985); *Kalo*, supra note 3 ("[R]ule B effectively bases jurisdiction on the mere presence of the defendant's property within the forum.").

*Blueye Navigation, Inc. v. Oltenia Navigation, Inc.*, Nos. 94 Civ. 1500(LAP) 94 Civ. 2653(LAP), 1995 WL 66654, at *4 (S.D.N.Y. Feb.17, 1995) (emphasis added); *see also Gavilanes v. Matavosian*, 123 Misc.2d 868, 475 N.Y.S.2d 987, 989 (N.Y.City Civ.Ct.1984) ("a New York court cannot attach property not within its jurisdiction"). Judge Preska's reasoning is sound. Accordingly, there must be a res to attach in the district, unless Limonium's reliance on *Digitrex* is well-founded. I find that it is not.

The traditional rule in New York provides "that each branch of a bank is a separate entity, [and is] in no way concerned with the accounts maintained by depositors in other branches or at a home office." *Cronan v. Schilling*, 100 N.Y.S.2d 474, 476 (N.Y.Sup.Ct. 1950) (citations omitted). In recent years, however, some limitations have been placed on the separate entity rule due to advances in computer and communications technologies and the accompanying centralization of functions at the main offices of large banks. For example, in *Digitrex*, this Court held that where bank branch offices within the same jurisdiction are connected to the bank's main office by high-speed computers and are under the control of the main office, a restraining notice may validly be served on the main office of a bank in order to effectively reach accounts maintained at the bank's branches. 491 F.Supp. 66 (S.D.N.Y.1980).

New York decisions since *Digitrex* have determined the validity of the service of restraining notices and subpoenas "on a case by case basis in relation to a bank's existing computer operations and the burden imposed by compliance." *Carrick Realty Corp. v. Flores*, 157 Misc.2d 868, 598 N.Y.S.2d 903, 907 (N.Y.City Civ.Ct.1993); *see S & S Machinery Corp. v. Manufacturers Hanover Trust Co.*, 219 A.D.2d 249, 638 N.Y.S.2d 953, 955–56 (1st Dep't 1996); *see also Reibor Int'l*, 759 F.2d at 264–65; *Fidelity Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp.*, 921 F.Supp. 1113, 1119–20 (S.D.N.Y.1996); *but see Therm–X Chemical & Oil Corp. v. Extebank*, 84 A.D.2d 787, 444 N.Y.S.2d 26, 27 (2d Dep't 1981) (the Appellate Division limited *Digitrex* by requiring that the traditional branch bank rule be followed "where the main office of the bank does not have high speed computers with central indexing capabilities to keep track of depositors' accounts").

■ Limonium's argument for extraterritorial attachment of funds in Mizushima's account at RBS/London by service of a writ of attachment on RBS/New York fails. The *Digitrex* exception to the separate entity rule is only applicable where: (1) the restraining notice is served on the bank's main office; (2) the bank's main office and branches are within the same jurisdiction; and (3) the bank branches are connected to the main office by high-speed computers and are under the centralized control of the main office. *Fidelity Partners, Inc.*, 921 F.Supp. at 1119–20 (citing *Digitrex*). Limonium cannot satisfy even one of these three requirements.

■ The purpose of the separate entity rule is clear:

> Service on one branch should not be permitted to accomplish a restraint on accounts and funds in other branches because of the substantial interference with routine banking business.

*Cronan,* 100 N.Y.S.2d at 476. In *Digitrex,* Judge Knapp found that this justification for the traditional rule was no longer persuasive. Judge Knapp accepted the argument that, given the employment of "highspeed computers with central indexing capabilities" and the centralization of various administrative functions, including the ability to impose holds on customer accounts, the "service of a restraining notice at the Bank's main office promotes, rather than endangers, the orderly transaction of banking business." *Digitrex,* 491 F.Supp. at 68. Under those circumstances, Judge Knapp found that service on the main office would cause "no interference" with routine banking business. *Id.* at 69 n. 1.

■ Here, the writ of attachment was served on RBS's branch office in New York in hopes of reaching Mizushima's accounts maintained in RBS's London office. However, not surprisingly, RBS's main office is in Edinburgh, United Kingdom. (See Keane Aff. Exs. 15–18). The requirement under *Digitrex* that the restraining notice be served on the bank's main office is clearly not satisfied here. A rule providing that service of a restraining notice on one bank branch (e.g., New York) suffices to reach assets in another bank branch in a city in a different country (e.g., London) would cause substantial interference with routine banking business, and no case has been cited to me where such a restraint was held to be effective. *Cf. D/S A/S Flint v. Sabre Shipping Corp.,* 228 F.Supp. 384 (E.D.N.Y.1964) (pre-*Digitrex* case rejecting Rule B attachment of assets outside district), *aff'd sub nom., Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.,* 341 F.2d 50 (2d Cir.1965); *Shinto v. Fibrex,* 425 F.Supp. 1088 (N.D.Ca.1976) (same), *aff'd,* 572 F.2d 1328 (9th Cir.1978).

With respect to the second requirement that the bank branches be in the same jurisdiction, Limonium is plainly not seeking to

reach funds maintained at one branch within this jurisdiction by serving the main office (or another branch, for that matter) within this jurisdiction. Rather, Limonium seeks to reach funds at RBS's London office—across the Atlantic Ocean and in another sovereign nation. *See Fidelity Partners,* 921 F.Supp. at 1120 (rejecting application for attachment of assets at Philippine National Bank's Manila headquarters by service on the bank's New York branch).[5] Accordingly, Limonium's argument fails on this basis as well.

Finally, with respect to the centralized administration and technological capabilities of RBS, as discussed above, Mizushima has presented evidence that RBS's New York branch has neither control of nor computerized access to Mizushima's account at RBS/London. (Bonnar Decl. 2). Bonnar explained that RBS/New York and RBS/London maintain separate computer systems to track deposits. (*Id.*). These facts further demonstrate that RBS's two branch offices in New York and London should be considered separate entities for attachment purposes.

In sum, Rule B attachment is not possible because no property of Mizushima or Lygnos Brothers Shipping, Inc. has been located within the district. Limonium's arguments against such a requirement are unpersuasive in light of *Blueye Navigation, Inc.,* 1995 WL 66654, at *4. Finally, Limonium's arguments based on *Digitrex* fail on the facts of this case.

### B. *Mizushima's Motion To Quash Subpoenas Served On Garnishees*

Mizushima moves to quash the subpoenas issued to the four garnishees on the grounds that there is no need for further discovery with respect to the issue of Limonium's Rule B attachments since they are void, and that all other matters are referable to arbitration.

5. Limonium attempts to distinguish *Fidelity Partners* on the grounds that Judge Schwartz relied heavily upon the fact that the plaintiff "Philguarantee has no right or entitlement to draw on its account [in Manila] at PNB's New York branch." In the case at bar, argues Limonium, defendants can access their funds in New York. The evidence suggests otherwise. Moreover, Limonium's review of *Fidelity Partners* omits several critical points. Judge Schwartz also found that

"PNB's New York branch has neither control nor managerial direction over PNB's Manila main office," and that "PNB's New York branch maintains no records regarding any accounts that Philguarantee has in Manila." 921 F.Supp. at 1120. Both points are equally true of the relationship between RBS/New York and RBS/London. Indeed, since both are branch offices, there is even stronger support here for considering the offices separate entities than in *Fidelity Partners.*

(Miz. Mem. at 10–12). In its prayer for relief, Limonium requests this Court direct the garnishees to comply with the subpoenas served upon them, although Limonium fails to argue this point or cite any authority in its briefs.

■ A Rule B attachment only reaches assets in the hands of a garnishee at the time of the service of the writ of attachment. *See Reibor Int'l,* 759 F.2d at 265–66; *Metal Transport Corp.,* 1990 WL 55687, at *2; *see also Union Planters Nat'l Bank v. World Energy Systems Assocs.,* 816 F.2d 1092, 1098 (6th Cir.1987). Since all four garnishees have responded that they are not in possession of any assets of Mizushima (*see* Gutowski Aff. Exs. 9–12), and I have found that Limonium's service of a writ of attachment on RBS/New York was ineffective to reach Mizushima's account at RBS/London, the writs of attachment are void. Accordingly, the subpoenas issued to the garnishees are quashed. *See Blueye Navigation, Inc.,* 1995 WL 66654, at *6 (finding the district court lacked authority to grant discovery under Rule B where no property has been attached).

## C. *Mizushima's Motion To Compel Arbitration*

Mizushima argues that the present action—at least insofar as it is brought against any defendant other than Mizushima itself—is barred under the doctrines of res judicata and collateral estoppel by both the December 11, 1995 decision from the bench by Judge Walls and the final written Opinion in that action dated April 23, 1996. Accordingly, Mizushima requests that I compel the parties to the Charter to arbitration.

Limonium argues that res judicata is inapplicable because the prior judgment was a dismissal without prejudice and because the instant case does not assert the same cause of action. Limonium further argues that collateral estoppel is inapplicable because the issues in this action were neither raised nor adjudicated in the New Jersey action.

The real thrust of Mizushima's argument is that Judge Walls rejected Limonium's pre-arbitration effort to bring claims against alleged alter egos. Mizushima relies heavily on the following portion of Judge Walls's April 23, 1996 Opinion:

> [T]his court declines to decide the alter ego issue. First, the Court believes that it would [be] premature to adjudicate the issue because the question of Mizushima's liability remains to be determined by arbitration. If Mizushima is found not to be liable, then the alter ego issue would be moot. Moreover, if Mizushima is liable, then the alter ego issue would only need to be resolved if Mizushima lacked sufficient assets to cover the arbitral award.

*Nissho Iwai Corp.,* No. 95–3771, slip op. at 11. Mizushima also relies on the following statement made by Judge Walls at the December 11, 1995 hearing:

> I am suggesting, and I am not only suggesting but determining that those [alleged alter egos] are not really necessary for our discussion because our discussion is based upon who were the original parties, who were the original parties to the voluntarily decided upon arbitration clause, and you should go that route. If you win, then you can proceed to find out and we can all find out, the merits of the other parties' involvement. If you lose, then we do not need to waste time.

(Williams Aff. Ex. 4 (Tr. at 8–9)).

■ I find that the above statements by Judge Walls, while demonstrating a great deal of common sense, are dicta; they are Judge Walls's view as to the most sensible and efficient way for the litigation and arbitration to proceed. Judge Walls stated several times that he was not reaching the issues of who is a "party" to the Charter or who may be bound by the arbitration provision:

> I am not making any determination on that [arbitrability of the alter ego claims]. It may well be that matter could be arbitrated. I don't know, but I am not really deciding that. I am saying as far as I am concerned, that you should go to New York to take care of the basic problem, and if these people aren't really alter egos, the arbitrator may determine that to be so, but I am not determining what he or she will do.

(Williams Aff. Ex. 4 (Tr. at 9–10)); *see also Nissho Iwai Corp.*, No. 95–3771, slip op. at 11 ("This Court declines to decide the alter ego issue."). In addition, Judge Walls explained:

> [T]he plaintiff's argument that the 31 other defendants could not be compelled to arbitrate in New York is in error. The plaintiffs could simply go to federal court in New York, and ask the court to settle the question of whether the 31 other defendants are really alter egos. If the court finds that they are, the plaintiffs could then, pursuant to U.S.C. § 4, request the court to compel them to arbitrate.
>
> If a federal court finds sufficient evidence that the 31 other defendants really are alter egos, there is no reason as a matter of law, why it may not require them to join Mizushima in the arbitration. Thus, since the Court determines that the claims against the 31 other defendants are arbitrable, it need not sever them from those against Mizushima.

*Nissho Iwai Corp.*, No. 95–3771, slip op. at 10. Clearly, Judge Walls did not intend to preclude Limonium from asserting claims in this Court, or in an arbitration proceeding, against any alleged alter egos.[6]

■ Nonetheless, I am granting Mizushima's motion to compel Limonium and Mizushima to arbitrate their disputes under the Charter. The Federal Arbitration Act establishes a federal policy favoring arbitration. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225–26, 107 S.Ct. 2332, 2336–37, 96 L.Ed.2d 185 (1987); *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2452–53, 41 L.Ed.2d 270 (1974). The Act requires the federal courts to enforce arbitration agreements with the same vigor that the courts enforce other contracts. *Dean Witter Reynolds, Inc. v.*

*Byrd*, 470 U.S. 213, 219, 105 S.Ct. 1238, 1241–42, 84 L.Ed.2d 158 (1985). Once a court is satisfied that an arbitration agreement is valid and the claim before it is arbitrable, it must stay further judicial proceedings and order the parties to proceed to arbitration. 9 U.S.C. §§ 2 and 3; *see Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 45 (2d Cir.1993) (citing *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir.1987)); *McMahan Securities Co. v. Forum Capital Markets L.P.*, 35 F.3d 82, 85–86 (2d Cir. 1994). Here, there is no dispute that the Charter, and its arbitration clause, are valid as between Limonium and Mizushima. It is also undisputed that the claims asserted by Limonium against Mizushima are covered by the broad arbitration clause at issue here.

■ The only dispute involves the participation of the alleged alter ego defendants in the arbitration. Mizushima has taken the position that these defendants are not party to the Charter and cannot be compelled to arbitrate. Limonium argues that they can be compelled to arbitrate as alter egos. I agree with Judge Walls's common sense approach: Limonium and Mizushima should arbitrate their dispute and resolve Mizushima's liability, if any, before the question of alter egos is litigated. It does not make sense to litigate the alter ego liability of some eighty-two individuals and entities before resolving the question of primary liability first. Accordingly, Mizushima's motion to compel arbitration is granted as to the parties to the Charter and the remainder of the case is stayed pending arbitration.

### D. *Limonium's Motion For A Preliminary Injunction*

Limonium moves for a preliminary injunction prohibiting the transfer of assets, suffi-

---

**6.** It is clear that "arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). However, " '[i]n an appropriate situation, the corporate veil may be pierced and a party may be held bound to arbitrate as the signatory's alter ego.' " *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1520 (3d Cir.

1994) (citing *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 539 (2d Cir.1975) (citation omitted)), *aff'd*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). If a non-signatory to a contract with an arbitration clause did not clearly agree to submit the question of arbitrability to arbitration, the question of arbitrability is subject to independent review of the courts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

cient to satisfy an award or judgment in this matter, from the accounts of Mizushima, as well as Peter Lygnos, George Lygnos, and various companies affiliated with the Lygnos brothers.

 In this Circuit, it is well-established that to obtain a preliminary injunction, an applicant must show that he:

> is likely to suffer irreparable injury if [such] relief is denied [and] there is either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the [applicant's] favor.... As a general rule, of course, a party may not obtain injunctive relief where is claiming a loss that can be adequately remedied by an award of money damages.... Yet, even where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant "intended to frustrate any judgment on the merits" by "transfe[rring its assets] out of the jurisdiction."

*In re Feit & Drexler, Inc.,* 760 F.2d 406, 415–16 (2d Cir.1985) (citations omitted).

Even assuming for purposes of Limonium's motion that it has shown a likelihood of success on the merits, I find that it has not shown a likelihood of irreparable harm. Despite Limonium's repeated allegations that Mizushima and the Lygnos brothers are dissipating the assets of Mizushima by transferring them to other entities under their control, these allegations amount to nothing more than speculation and conjecture. "[I]njunctive relief can and should be predicated only on the basis of a showing that the alleged threats of irreparable harm are not remote or speculative but are actual and imminent." *KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 14 (2d Cir. 1979) (citing *State of N.Y. v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 755 (2d Cir. 1977)). Since Limonium's damages are monetary in nature, and its allegations that defendants are dissipating their assets are speculative at best, Limonium's motion for a preliminary injunction is denied.

## CONCLUSION

For the foregoing reasons: (1) Mizushima's motion to vacate the writs of maritime attachment is granted; (2) Mizushima's motion to quash the subpoenas served upon the garnishees is granted; (3) Mizushima's motion to compel Limonium to arbitrate is granted; and (4) Limonium's cross-motion for a preliminary injunction is denied. Further proceedings in this case are stayed pending resolution of the arbitration.

SO ORDERED.