OPINION OF THE COURT
Graffeo, J.
In this case, the United States Court of Appeals for the Second Circuit asks us whether the “separate entity” rule prevents a judgment creditor from ordering a garnishee bank operating branches in New York to restrain a judgment debtor’s assets held in foreign branches of the bank. We conclude that it does.
I
Between April 1998 and September 2000, several members of the Uzan family (the Uzans) induced plaintiff Motorola Credit Corporation (Motorola) to loan over $2 billion to a Turkish telecommunications company they controlled, purportedly to finance a major expansion of the company’s operations. Unbeknownst to Motorola, the Uzans diverted a substantial portion of these funds to themselves and other entities they controlled. In 2003, after discovering that the Uzans had “perpetrated a huge fraud” and concealed “their scheme through an almost endless series of lies, threats, and chicanery,” the United States District Court for the Southern District of New York entered a judgment in Motorola’s favor for compensatory damages of about $2.1 billion (Motorola Credit Corp. v Uzan, 274 F Supp 2d 481, 490 [SD NY 2003]). Three years later, the District Court awarded Motorola an additional $1 billion in punitive damages (see Motorola Credit Corp. v Uzan, 413 F Supp 2d 346 [SD NY 2006]).
The Uzans have gone to great lengths to avoid satisfying the judgments and remain in contempt for failure to comply with *157 the District Court’s orders, subjecting them to arrest if they enter the United States. As a result of enforcement obstacles, Motorola has pursued collection of the judgments through third-party discovery and the District Court has conducted postjudgment proceedings ex parte and under seal. In February 2013, the District Court entered an order pursuant to Federal Rules of Civil Procedure rules 65 and 69 and CPLR 5222 restraining the Uzans and anyone with notice of the order from selling, assigning or transferring their property.
Motorola served the restraining order on the New York branch of defendant Standard Chartered Bank (SCB), a foreign bank incorporated and headquartered in the United Kingdom. SCB, which had no connection to Motorola’s loan to the Uzans or the underlying litigation, did not locate any Uzan property at its New York branch. Two months later, a global search of its branches revealed Uzan-related assets valued at roughly $30 million in its branches in the United Arab Emirates (U.A.E.). SCB froze those assets in accordance with the restraining order, but regulatory authorities in the U.A.E. and Jordan quickly intervened. The Central Bank of Jordan sent a bank examiner to seize documents at SCB’s Jordan branch, while the U.A.E. Central Bank unilaterally debited about $30 million from SCB’s account with the bank.
In May 2013, SCB sought relief from the restraining order, claiming in the District Court that the restraint of the $30 million in assets violated U.A.E. law and subjected it to double liability. SCB also contended that, under New York’s separate entity rule, service of the restraining order on SCB’s New York branch was effective only as to assets located in accounts at that branch and could not freeze funds situated in foreign branches. In opposition, Motorola asserted that the separate entity rule was no longer valid law in light of Koehler v Bank of Bermuda Ltd. (12 NY3d 533 [2009]), where we held that a judgment creditor could seek the turnover of stock certificates located outside the country so long as the court had personal jurisdiction over the garnishee. In a sealed order, the District Court agreed with SCB and concluded that the separate entity rule precluded Motorola from restraining assets at SCB’s foreign branches. Nevertheless, the District Court stayed the release of the restraint pending the outcome of Motorola’s appeal.
The Second Circuit, recognizing that we have never explicitly addressed the separate entity doctrine and finding that its viability was unclear in the wake of Koehler, certified the following question to us:
*158 “[W]hether the separate entity rule precludes a judgment creditor from ordering a garnishee bank operating branches in New York to restrain a debtor’s assets held in foreign branches of the bank” (740 F3d 108, 118 [2d Cir 2014]).
We accepted certification (22 NY3d 1113 [2014]).[1]
II
Motorola, as the judgment creditor, argues that the service of a CPLR 5222 restraining notice on the New York branch of a foreign bank garnishee is sufficient to freeze the funds of the judgment debtor in any branch account with the bank, regardless of where the assets are located. Motorola questions whether the separate entity rule, which is not mentioned in CPLR article 52, was ever the law of New York and asserts that, even if it was, we necessarily abolished it in Koehler. In any event, Motorola asks us to disavow the separate entity doctrine as outmoded and unnecessary.
As the garnishee bank, SCB responds that the separate entity rule is deeply rooted in New York banking law and that foreign banks have reasonably relied on it over the years when deciding whether to open branches and conduct business in New York. Supported by several amici curiae, SCB asserts that Koehler did not discard the separate entity rule and urges that the rule remains vital in the context of international banking. Unlike our dissenting colleagues, we conclude that SCB has the better argument.
The separate entity rule, as it has been employed by lower New York courts and federal courts applying New York law, provides that even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes, particularly with respect to CPLR article 62 prejudgment attachments and article 52 postjudgment restraining notices and turnover orders (see Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v Advanced Empl. Concepts, 269 AD2d 101 [1st Dept 2000]; Therm-X-Chem. & Oil Corp. v Extebank, 84 AD2d 787 [2d Dept 1981]; Allied Mar., Inc. v Descatrade SA, 620 F3d 70, 74 [2d Cir *159 2010]). In other words, a restraining notice or turnover order served on a New York branch will be effective for assets held in accounts at that branch but will have no impact on assets in other branches.[2]
Courts and commentators traditionally have ascribed three basic rationales for the separate entity doctrine. First, courts applying the rule have emphasized the importance of international comity and the fact that “any banking operation in a foreign country is necessarily subject to the foreign sovereign’s own laws and regulations” (Global Tech., Inc. v Royal Bank of Can., 34 Misc 3d 1209[A], 2012 NY Slip Op 50023[U], *3 [Sup Ct, NY County 2012] [internal quotation marks and citation omitted]). Second, it was viewed as necessary to protect banks from being “subject ... to competing claims” and the possibility of double liability (Shaheen Sports, Inc. v Asia Ins. Co., Ltd., 2012 WL 919664, *5, 2012 US Dist LEXIS 36720, *14 [SD NY, Mar. 14, 2012, Nos. 98-CV-5951 (LAP), 11-CV-920 (LAP)]), a concern strenuously voiced by the amici in this case. And third, the rule has been justified based on the “intolerable burden” that would otherwise be placed on banks to monitor and ascertain the status of bank accounts in numerous other branches (Cronan v Schilling, 100 NYS2d 474, 476 [Sup Ct, NY County 1950], aff'd without op 282 App Div 940 [1st Dept 1953]; see generally Geoffrey Sant, The Rejection of the Separate Entity Rule Validates the Separate Entity Rule, 65 SMU L Rev 813, 814 [2012]).
The existence of the separate entity rule as a component of New York’s common law can be traced back to a 1916 decision (see Chrzanowska v Corn Exch. Bank, 173 App Div 285, 291 [1st Dept 1916], affd without op 225 NY 728 [1919] [“With respect to the question presented for decision, the different branches were as separate and distinct from one another as from any other bank”]). It was first applied in the postjudgment context a few decades later in Walsh v Bustos, where the court concluded that a restraining order served on a New York branch of the *160 bank garnishee did not “extend to the deposits of the judgment debtor in the Mexican branch of this foreign bank” (46 NYS2d 240, 241 [NY City Ct 1943]). By the 1950s and 1960s, the separate entity rule was described by state and federal courts as “well established” (Cronan, 100 NYS2d at 476) and supported by “a consistent line of authority” (Det Bergenske Dampskibsselskab v Sabre Shipping Corp., 341 F2d 50, 53 [2d Cir 1965]). And its endurance continues into the twenty-first century in the postjudgment context (see Gliklad v Bank Hapoalim B.M., 2014 NY Slip Op 32117[U] [Sup Ct, NY County 2014]; Parbulk II AS v Heritage Mar., SA, 35 Misc 3d 235, 238-239 [Sup Ct, NY County 2011]; Fidelity Partners, Inc. v Philippine Export & Foreign Loan Guar. Corp., 921 F Supp 1113, 1119-1120 [SD NY 1996]). Although we have not expounded on the separate entity rule,[3] contrary to Motorola’s suggestion, it is a firmly established principle of New York law, with a history of application both before and after the 1962 adoption of the CPLR.
Motorola argues that we abrogated the rule five years ago in Koehler v Bank of Bermuda Ltd. (12 NY3d 533 [2009]), a case in which a judgment creditor secured a CPLR 5225 turnover order directing a garnishee bank in Bermuda to deliver stock certificates belonging to the judgment debtor. The bank consented to personal jurisdiction based on the presence of a subsidiary in New York.[4] The question certified to us by the Second Circuit was “whether a court sitting in New York may order a bank *161 over which it has personal jurisdiction to deliver stock certificates owned by a judgment debtor (or cash equal to their value) to a judgment creditor, pursuant to CPLR article 52, when those stock certificates are located outside New York” (id. at 536). We answered that inquiry in the affirmative, concluding that “the Legislature intended CPLR article 52 to have extraterritorial reach” and that “the key to the reach of the turnover order is personal jurisdiction over a particular defendant” (id. at 539-540). Because the bank admitted that the New York courts had secured personal jurisdiction over it, the turnover order was properly directed at the stock certificates in Bermuda.
Notably absent from our decision in Koehler was any discussion of tbe separate entity rule. We discern two reasons for our silence on the subject. As an initial matter, the foreign bank did not raise the issue so we had no occasion to examine the doctrine. Second, the separate entity rule, as it has been applied by the courts, would not have aided the bank in Koehler because that case involved neither bank branches nor assets held in bank accounts.[5] In short, we did not analyze, much less overrule, the separate entity doctrine in Koehler. Nor, as the dissent believes, is the rule irreconcilable with our holding in Koehler that the scope of CPLR article 52 is generally tied to the exercise of personal jurisdiction over a garnishee. As a long-standing common-law doctrine, the separate entity rule functions as a limiting principle in the context of international banking, particularly in situations involving attempts to restrain assets held in a garnishee bank’s foreign branches. We therefore reject Motorola’s view that Koehler decided the issue before us.
Motorola and the dissent further submit that the separate entity rule is incompatible with CPLR article 52 because nothing in CPLR 5222, governing postjudgment restraining notices, expressly embraces the rule. Motorola cites Commonwealth of the N. Mariana Is. v Canadian Imperial Bank of Commerce, where we stated, in determining the expanse of CPLR article 52, that the “starting point is the language itself, giving effect to the plain meaning thereof’ (21 NY3d 55, 60 [2013] [internal *162 quotation marks and citation omitted]). But Motorola’s reliance on Canadian Imperial Bank is misplaced because the separate entity rule predates the CPLR by several decades and the issue is not one of statutory construction but, rather, whether to retain a common-law principle.
Finally, we decline Motorola’s invitation to cast aside the separate entity rule. As discussed, the doctrine has been a part of the common law of New York for nearly a century. Courts have repeatedly used it to prevent the postjudgment restraint of assets situated in foreign branch accounts based solely on the service of a foreign bank’s New York branch. Undoubtedly, international banks have considered the doctrine’s benefits when deciding to open branches in New York, which in turn has played a role in shaping New York’s “status as the preeminent commercial and financial nerve center of the Nation and the world” (Ehrlich-Bober & Co. v University of Houston, 49 NY2d 574, 581 [1980]).
In large measure, the underlying reasons that led to the adoption of the separate entity rule still ring true today. The risk of competing claims and the possibility of double liability in separate jurisdictions remain significant concerns, as does the reality that foreign branches are subject to a multitude of legal and regulatory regimes. By limiting the reach of a CPLR 5222 restraining notice in the foreign banking context, the separate entity rule promotes international comity and serves to avoid conflicts among competing legal systems (see generally Daimler AG v Bauman, 571 US —, —, 134 S Ct 746, 763 [2014] [recognizing the importance of considering “the risks to international comity”]). And although Motorola suggests that technological advancements and centralized banking have ameliorated the need for the doctrine, courts have continued to recognize the practical constraints and costs associated with conducting a worldwide search for a judgment debtor’s assets (see Samsun Logix Corp. v Bank of China, 31 Misc 3d 1226[A], 2011 NY Slip Op 50861[U], *4 [Sup Ct, NY County 2011] [stating that “the Banks submitted numerous affidavits to the effect that the computer systems in the New York branches of the Banks do not provide access to customer account information at the head office or at branches outside of the United States”]).[6]
*163 Indeed, as the District Court observed, the facts of this case aptly demonstrate that the policies implicated by the separate entity rule run deeper than the ability of a bank to communicate across branches. In seeking to comply with the restraining order, SCB faced regulatory and financial repercussions abroad. Representatives of the Central Bank of Jordan compelled SCB to disclose records and directed SCB to immediately unfreeze the assets. The U.A.E. Central Bank, which possesses regulatory oversight in that nation, would not allow SCB’s Uzanrelated payment obligation to remain unsatisfied. As a result, the U.A.E. Central Bank debited SCB’s account with that hank for an amount equivalent to the frozen funds — approximately $30 million. In essence, SCB was placed in the difficult position of attempting to comply with the contradictory directives of multiple sovereign nations.
Consequently, in contrast to the dissent, we believe that abolition of the separate entity rule would result in serious consequences in the realm of international banking to the detriment of New York’s preeminence in global financial affairs. For all of these reasons, we conclude that a judgment creditor’s service of a restraining notice on a garnishee bank’s New York branch is ineffective under the separate entity rule to freeze assets held in the bank’s foreign branches.
Accordingly, the certified question should be answered in the affirmative.

. The Second Circuit also certified a related question in a companion case involving the application of the separate entity rule in the CPLR 5225 turnover context (see Tire Eng’g & Distrib. L.L.C. v Bank of China Ltd., 740 F3d 108 [2d Cir 2014]), but that certified question was later withdrawn (22 NY3d 1152 [2014]).

. Most cases applying the separate entity rule involved bank branches in foreign countries, but some have applied the rule to bar a restraint even where the unserved branch is located in New York (see e.g. Det Bergenske Dampskibsselskab v Sabre Shipping Corp., 341 F2d 50, 53-54 [2d Cir 1965]). In this case, we have no occasion to address whether the separate entity rule has any application to domestic bank branches in New York or elsewhere in the United States. The narrow question before us is whether the rule prevents the restraint of assets held in foreign branch accounts, and we limit our analysis to that inquiry.

. We affirmed, without opinion, in two cases involving the separate entity-rule (see McCloskey v Chase Manhattan Bank, 11 NY2d 936 [1962]; Chrzanowska v Corn Exch. Bank, 225 NY 728 [1919]).

. Similarly, in this case personal jurisdiction over SCB was predicated on the presence of its New York branch. The District Court noted that SCB did not dispute that personal jurisdiction existed on this basis. Motorola, too, asserts in its brief that SCB “has never contested personal jurisdiction.” However, SCB now appears to challenge personal jurisdiction in light of the U.S. Supreme Court’s nascent decision in Daimler AG v Bauman, which held that general jurisdiction over a foreign corporation may not be predicated solely on the ground that the corporation “engages in a substantial, continuous, and systematic course of business” in the state (571 US —, —, 134 S Ct 746, 761 [2014] [internal quotation marks and citation omitted]). Rather, as a matter of due process, general jurisdiction exists only if the corporation is “essentially at home in the forum State” (571 US at —, 134 S Ct at 761 [internal quotation marks and citation omitted]), typified by “the place of incorporation and principal place of business” (571 US at —, 134 S Ct at 760). Here, SCB observes that it is incorporated under the laws of the United Kingdom and headquartered there. Whether New York has personal jurisdiction over SCB— and whether SCB may still litigate the federal constitutional issue at this juncture — are questions that must be resolved by the federal courts. The sole issue before us on this certified question is whether the common-law separate *161 entity rule prevents Motorola’s restraint of assets held by SCB’s foreign branches.

. It would appear that the judgment creditor in Koehler also served the bank itself in Bermuda, not only its New York subsidiary, providing yet another reason for the inapplicability of the separate entity rule in that case (see Koehler v Bank of Bermuda Ltd., 2005 WL 551115, *12, 2005 US Dist LEXIS 3760, *35 [SD NY, Mar. 9, 2005, No. M18-302 (CSH)] [“Assuming service to be proper, the separate entity rule has no role to play in this case”]).

. As the dissent highlights, one court questioned the validity of the separate entity rule in light of computerized banking (see Digitrex, Inc. v Johnson, *163 491 F Supp 66 [SD NY 1980]). But courts subsequently limited the so-called Digitrex exception to cases where “(1) the restraining notice is served on the bank’s main office; (2) the bank’s main office and branches are within the same jurisdiction; and (3) the bank branches are connected to the main office by high-speed computers and are under the centralized control of the main office” (Limonium Mar., S.A. v Mizushima Marinera, S.A., 961 F Supp 600, 607 [SD NY 1997]; see also Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v Advanced Empl. Concepts, 269 AD2d 101, 102 [1st Dept 2000]).