State of New York v Kirby H. (2025 NY Slip Op 51785(U))

[*1]

State of New York v Kirby H.

2025 NY Slip Op 51785(U)

Decided on November 10, 2025

Supreme Court, Bronx County

Bowen, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 10, 2025
Supreme Court, Bronx County

The State of New York, Petitioner,

against
Kirby H., Respondent.

Index No. SMZ-075541-23

Andrew Fukuda and Jeffrey Jackson, Assistant Attorney Generals, for the State
Tess Alexander and Sara Molinaro, Mental Hygiene Legal Service, for Respondent

E. Deronn Bowen, J.

Summary
1) Bench Trial VERDICT: The State has not proven by clear and convincing evidence that respondent is a detained sex offender currently with a mental abnormality (Mental Hygiene Law § 10.03 [i]).
2) The Article 10 petition is ORDERED to be DISMISSED.
3) The court STAYS SEALING of this matter for 30 days from the date of this decision and order.
I. Introduction
On September 22, 2023, respondent, Kirby H., was convicted, upon a plea of guilty, of sexual abuse in the first degree (Penal Law § 130.65 [4]) and sentenced to three years' incarceration followed by a 10-year term of post-release supervision. On November 30, 2023, the New York State Attorney General's Office filed a sex offender civil management petition (Mental Hygiene Law § 10.06 [a]), and on December 8, 2023, probable cause was found to believe that respondent is a detained sex offender requiring civil management (Index No. E2023-1885 [Sup Ct, Sullivan County, Dec. 8, 2023] [Stephan G. Schick, J.]; Mental Hygiene Law § 10.06 [g], [k]). Following respondent's knowing and voluntary waiver of the right to a jury trial (Mental Hygiene Law § 10.07 [b]), the court conducted a bench trial on September 23, 24 and 29, 2025 (Mental Hygiene Law § 10.07).
The State called two witnesses, Dr. Shari Lo-Rhoden and Dr. Katrina Colistra. Dr. Joseph J. Plaud testified as a witness for respondent. Dr. Lo-Rhoden is a psychiatric examiner with the New York State Office of Mental Health. Dr. Colistra is a licensed psychologist in private [*2]practice. Dr. Plaud, a clinical and forensic psychologist, is the founder and executive director of Applied Behavioral Consultants, LLC. All three were recognized without objection as experts in the field of psychology.
The following documents were entered into evidence without objection:
State's Exhibit 1: Certificate of disposition for respondent's underlying offense;
State's Exhibit 2: Certificate of incarceration per respondent's underlying offense;
State's Exhibit 3: Curriculum vitae of Shari Lo-Rhoden, Psy.D.;
State's Exhibit 4: Curriculum vitae of Katrina Colistra, Psy.D.;
Respondent's Exhibit A: Respondent's most recent sex offender treatment records covering the period of January 14 — June 5, 2025; and
Respondent's Exhibit B: Curriculum vitae of Joseph Julian Plaud, Ph.D.
II. Trial Evidence
A. Sexual Offense History
Respondent's criminal sexual history began at the age of 20 in August 2003. While working as a camp counselor in Pennsylvania, respondent engaged in sexual acts separately with two seven-year-old boys, namely, placing one's penis into her mouth and masturbating the other.[FN1]
 Respondent was convicted, upon a plea of guilty, of rape of a child in the first degree of the former boy (18 Pennsylvania Consolidated Statutes Annotated § 3121 [c]) and indecent assault of the latter boy (18 Pennsylvania Consolidated Statutes Annotated § 3126 [a] [7]), and sentenced to 6-to-13 years' incarceration.
Respondent was released from incarceration in 2014. While in the community as a Pennsylania parolee and sex offender (SORA) registrant, respondent was unsuccessfully discharged from outpatient sex offender treatment because of an unauthorized, consensual, romantic relationship with another adult offender in the same treatment program. The discharge constituted a parole violation that led to respondent's return to prison on February 10, 2016. Respondent was ultimately released from Pennsylvania incarceration on January 20, 2017.
Beginning in December 2017 in Bronx County, when respondent was 35 years old and about a month shy of the one-year mark of her release from Pennsylvania incarceration, she began to sexually victimize another child. The Bronx victim was the 11-year-old, autistic son of a friend who entrusted respondent to help care for him. The child, who had communication issues, eventually disclosed to his speech therapist that, over the course of nearly two years (December 2017 — August 2019), respondent had touched his penis as he bathed and had gotten into bed with him and touched his penis under his clothing. This led to respondent's 2023 conviction, after a plea of guilty, of sexual abuse in the first degree and, subsequently, the instant Article 10 petition. Respondent was released from New York incarceration on March 20, 2024, and since that time has resided at an inpatient Secure Treatment and Rehabilitation Center (STARC) operated by the New York State Office of Mental Health (Mental Hygiene Law § 10.06 [h]).
B. The State's Evidence
Dr. Lo-Rhoden conducted an initial Article 10 evaluation of respondent's records in 2023, and Dr. Colistra evaluated respondent's records for the State in preparation for this trial. [*3]Respondent declined the respective interview invitations of both of the State's experts. Dr. Lo-Rhoden testified that her previous professional opinion remains unchanged, despite having reviewed more recent treatment records post-dating the 2023 initial evaluation. The doctor testified that respondent suffers from an Article 10 mental abnormality, namely "[p]edophilic disorder, nonexclusive type, sexually attracted to males. . . . Nonexclusive means that there is an arousal—in addition to an arousal to prepubescent children [ ] there's also arousal to adults. And, in Ms. H's case, adult males is also another one of her arousal [sic] . . . considering her victim pool are [sic] all males."
Dr. Lo-Rhoden explained how, per her offense history, respondent satisfies the three criteria for a diagnosis of pedophilic disorder as set forth in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), namely, (1) "a pattern of six months of recurrent, intense sexually arousing fantasies, urges, behaviors towards a prepubescent child or children, which the DSM-5 defines as generally 13 years old or younger" ; (2) "the sexually arousing fantasies, behaviors must have been acted on or that it causes the individual personal or significant distress" ; and (3) "the individual must at least be 16 years old—that's the youngest that the pedophilic disorder can be given as a diagnosis—and that the preference is towards a minor that's at last five years younger than that 16-year-old individual." Dr. Lo-Rhoden testified that the DSM-5 defines pedophilic disorder as a chronic condition and explained the reasoning therefor. The "particular arousal and interest—and sexual arousal and interest—is [sic] unlikely to change in adulthood . . . . Just like for the most of us having an arousal to same sex, opposite sex, that arousal [to prepubescent children] seems—well, it's pretty fixed through adulthood."
Dr. Lo-Rhoden opined that respondent's history of criminal sexual offenses illustrates the chronic nature of her pedophilic disorder.
"At the committing of the first cluster of sex offenses, at that time his [FN2]
age was 20 years old. By the time she's committed the qualifying sex offense, she was around 35, 36 years old, which indicates even in that time span and timeframe that it's now chronic. It is now a significant portion of her life and her adult life at this point that this arousal is presenting."
Respecting respondent's first pair of offenses with the two summer camp boys, Dr. Lo-Rhoden found significant that
"the two incidents occurred in such short proximity to each other. It indicated that the timeframe was August 5th to August 16th [2003]. That those two incidences had occurred within that short timeframe, indication of just that strong sexual arousal, strong deviant sexual arousal to children, that she was able to offend against two victims in such close proximity in time. . . . There's no, like, I'm thinking, experiences of shame or fear of being caught or that—There's just that—such a strong urge and such a strong arousal to the young boys that it had to occur, that the second offense had to immediately occur."
Likewise with the 2017-2019 course of sexual contact with the 11-year-old underlying the Article 10-qualifying conviction, it was significant to Dr. Lo-Rhoden
"that Ms. H can easily be identified by the family, by the child, and there seems to be either a lack of awareness of that or that the sexual urges were just that strong. That [*4]regardless of that possibility of being caught offending against the child, that urge overpowered the possibility of being caught and the possible consequences to that behavior."
Dr. Lo-Rhoden was concerned that, while respondent admitted to the oral sexual contact with one of the two summer camp boys, she had for some time prior to her Pennsylvania plea disclaimed any criminality respecting the touching of the second boy's penis, claiming instead that the touching related only to checking and cleaning the child after a bedwetting incident.
"There's no reason for any caregiver to be touching a child's penis to find out if they have wet their pants. It's just lack of responsibility, minimizing the behavior that she's acted on.
. . . . [I]t is a risk factor that's, like, addressed in treatment and that speaks more to how a person will respond in treatment."
Similarly, during the police investigation into the 2017-2019 Bronx sexual assaults,
"[t]here were records regarding a controlled call with the victim's mother where Ms. H indicated accidently touching the victim over his pants—touching his penis over his pants accidentally during play. She also indicated touching the victim while the victim was in the shower, showing the victim how to wash his uncircumcised penis because she has similar experiences, and therefore, she was just showing the victim how to do it properly.
. . . .
A lot of initial denial, minimization of the behavior, and even through treatment kind of minimizing that arousal, pedophilic interest that kind of was driving the actual behavior, lack of responsibility [sic].
. . . .
Ms. H [ ] eventually admitt[ed] to touching the victim one time over his clothing, again, accidentally; and then shortly thereafter apologizing; and then taking the victim and the victim's two siblings to McDonald's afterwards; and indicating that everything was fine after that incident."
A related risk factor Dr. Lo-Rhoden indicated as common with all of respondent's sexual offenses was her "lack of this kind of remorse and empathy or acknowledgment of the possible consequences to the victim." She described what she viewed as respondent's lack of shame over the summer camp incidents and noted that, respecting respondent's 2017-2019 course of sexual abuse of her friend's son, "records indicat[e] that the victim suffered from PTSD [as a] result of the sexual abuse. So there seems to be . . . that lack of remorse but also kind of disregard for, kind of, laws and rules." Dr. Lo-Rhoden connected the lack of shame and remorse with respondent having
"indicated liking the attention of the children and therefore, you know, wanting to give something in return to them . . . .
. . . .
It speaks to this sense of emotional congruence and relatedness to children. Emotional congruence meaning it's easier to relate to children versus adults. Individuals who tend to have emotional congruence with young children kind of find similar interests with that particular age group. Ms. H's response to wanting to be liked or liking the attention of these seven-year-old boys is indication that she almost saw them as her peers, that they're equal. And, what we see oftentimes with pedophilic disorder is that that mentality or [*5]thinking when having that disorder is that it enables them to believe that younger children can consent to their sexual advances, can consent to that sexual contact. So, as even indicated in the DSM, emotional congruence is frequently related to pedophilic disorder as well.
. . . .
. . . . It also speaks to a risk in terms of a risk to sexually reoffend in the future.
. . . .
[W]e now see a pattern of over 6 months. We see that with the offending that occurred when Ms. H was age 20 and now occurring 15, 16 years later. And, again, similar sexual offending pattern, and it's showing this—the strength of the predisposition, the strength of her arousal to prepubescent children that despite prior sanctions, despite prior sex offender treatment, despite other external control such as parole supervision, which she was on at that time, she still committed the qualifying sex offense."
Interesting to Dr. Lo-Rhoden, the Bronx victim's outcries to his immediate family went unreported. It was an outcry to his speech therapist that led his rescue.
"The victim had initially reported to his mother and stepfather, and there was no action taken until the victim was taken to the speech therapist who reported the incidences. So, it indicated also that relationship—the grooming in that relationship, the grooming behaviors of, again, family members . . . to be able to trust Ms. H to have access to this child or to take care of this child. And, that built-in trust, again, with the family and the children as well as the victim."
This documented information contrasts significantly with respondent's initial statements to the police, despite her later admission and plea. Dr. Lo-Rhoden explained that,
"during the investigation for the qualifying sex offense, Ms. H had told the police that there was a disagreement between her and the victim's mother. The victim's mother, as reported by Ms. H, was upset that her child, the victim, was exhibiting gay tendencies and that Ms. H was a bad influence, kind of suggesting that Ms. H was the one influencing these more feminine tendencies in her child."
This history ties back into Dr. Lo-Rhoden's concerns of respondent's minimalization, deflection and lack of shame.
When asked on cross-examination whether "[i]t's normal for someone accused of a sex offense to initially deny the allegations," Dr. Lo-Rhoden responded, "It does happen." When asked to concede that, per the most recent records, respondent does admit to her sex offenses, Dr. Lo-Rhoden was rather evasive and vague in her responses before finally testifying, "I don't recall specifically admission of sex offenses in treatment. I understand that in the most recent evaluation with Dr. Plaud (respondent's psychiatric examiner), that she had admitted culpability for her offenses." Dr. Lo-Rhoden acknowledged on cross-examination that respondent reported being raised cisgender male by strictly religious parents who did not accept then-his homosexual orientation and "feminine" mannerisms. Respondent also self-reported being the victim, between the ages of five and 12, of oral and anal sexual abuse at the hands of older male cousins.
Nevertheless, Dr. Lo-Rhoden opined that respondent's overall sex offense history, covering Pennsylvania and New York,
"speaks to the strength of that sexual arousal, the strength of that disorder, that despite having already been sanctioned, having been arrested, going through the legal process and having had that legal sanction, having the external controls of having parole, having [*6]sex offender treatment in the community and despite all of that, still then commits another sex offense while being out in the community for 11 months—speaks to the strength and serious difficulty of controlling that disorder."
Dr. Lo-Rhoden testified that respondent's prison disciplinary record—during both her Pennsylvania and New York incarcerations—further support a finding of a mental abnormality. While incarcerated in Pennsylvania, Ms. H received three disciplinary infractions—one per year in each of 2009, 2010 and 2011—for consensual, but institutionally prohibited, sexual acts with age-appropriate men, including kissing and oral sex. Respondent received an internal prison sanction for each infraction, which constituted just a fraction of the total number of respondent's actual violations of the prison's strict ban on all forms of sexual intimacy between inmates.
"Records indicate that she did admit to engaging in sexual behaviors with other inmates, primarily giving oral sex and in—fewer instances of anal sex.
. . . .
Psychological relevance, the behaviors indicate that there's this disregard, again, for rules and norms. These are against policy in prisons and even if it's considered consensual amongst inmates, it's still against the rules. It speaks to, again, prioritizing her sexual urges and needs regardless of what the rules says [sic].
. . . .
[That there were three infractions in three years] points to more of her pattern of behavior indicating that just similar to her prior—her first set of cluster of sex offenses in terms of the violation of those rules, norms and laws [sic]. It spoke more to that she is continuing to just prioritize her needs and—regardless of whether the rules have to apply to her or not."
In Dr. Lo-Rhoden's view, that the entirety of respondent's in-custody sexual acts were consensual and with age-appropriate men does not mitigate in respondent's favor, as she diagnosed respondent with nonexclusive pedophilic disorder.
"Having a pedophilic disorder doesn't mean that Ms. H doesn't have an arousal to adult males. We're looking at where she is at current—at that time of those incidences which she was in a secure facility that only housed males. There's no children [sic] in those facilities. Children aren't allowed and therefore, she—and therefore there's—one, there's no offending against children but—the victim pool isn't available there. But, she is still engaging in sexual behaviors; that's still against the rules. So, she's still prioritizing her sexual urges and needs over—you know, over what the rules are."
Additionally, despite successfully completing sex offender programming while incarcerated in Pennsylvania, she was unsuccessfully discharged from community-based sex-offender treatment.
"While in program in the community, she was engaging in a romantic relationship with another sex offender parolee who was also in the same treatment program. Both Ms. H and the other parolee were unsuccessfully discharged from treatment as a result because this violated the program's policies. So, that this—that unsuccessful discharge from treatment then resulted in her return to prison at that point.
. . . .
It again points to that—the ability to violate the rules and regardless of that potential consequence, that even that possibility of possibly being returned back into incarceration was not enough of a hindrance to just follow the program rules."
Thus, Dr. Lo-Rhoden continued, respondent's sexual misconduct both while incarcerated and while in the community demonstrate that she is in fact not responding positively to sex offender treatment regardless of how well she may do with the programming portion itself. "In treatment, the record indicated she was doing well, was identifying some of her risky behaver, had the sexual autobiography completed. It sounded like she was participating well in treatment and appropriately prior to being discharged." Yet, when asked on direct examination whether sex offender treatment has in fact benefitted respondent. Dr. Lo-Rhoden testified,
"I don't believe so because it's not reflecting in how she's living in her current environment, meaning that those behaviors were still in violation to the rules of the facility. And, therefore, even if inside treatment she's presenting really well—saying exactly what she needs to say—what's coming out outside in—where she lives outside of treatment, she's still engaging in behaviors that's illegal to the facility.
. . . .
Again, it questions in terms of what she's carrying from treatment into her life. Inside treatment, inside group she's doing really well, and then come to find out she's in an undisclosed sexual or romantic relationship with another parolee, again, against policies of the treatment program."
On cross-examination Dr. Lo-Rhoden conceded that the totality of respondent's sexual improprieties while incarcerated and in treatment appear to have been consensual and would not have been unlawful or otherwise inappropriate were she at liberty. The doctor nonetheless maintained that the demonstrated pattern of rule-breaking inconsistent with sustained treatment gains. "[I]n treatment she—she seems to be high-functioning and able to grasp the treatment concepts. She's able to relate experiences to those treatment concepts." However, "what's happening in treatment is not what's happening outside of treatment. . . . [S]he presents really well in treatment group—does well, seems to be getting along with people she's living with—but there's these other incidences that seems to keep coming up throughout her time" at STARC.
These "other incidences" include respondent's relatives permitting young children in the household to be heard and seen during video calls with family members. As recently as "June 2025 was the last where staff overheard a little girl's voice in the background." Dr. Lo-Rhoden expressed concern with,
"considering Ms. H's diagnosis of pedophilic disorder, how this puts her in a risky situation . . . in terms of contact with minor children, particularly prepubescent children and that goes to her risk as well as that inability to really follow the rules. She's been told over and over that this is not allowed. It's against policy.
She's also in a program that houses civilly-confined sex offenders which, again, that's not necessarily safe for her family members. And, it speaks to her supports. People she's in constant communication with who are refusing to follow the policies aren't really positive supports for her."
Further, Dr. Lo-Rhoden continued, the repeated issue of children appearing during family video visits serves to illustrate that respondent would lack positive family support in the community.
"[T]he last time she was released on parole supervision, she was released to her mother's home, and despite again repeatedly registering in the Bronx, she at some point lived at least a year at her sister's home in New Jersey, thus violating her supervision requirements. So, this positive supports [sic] that's being noted is concerning because the positive supports are [*7]supposed to know what her requirements are and should be abiding by them as well. But, in this instance, she was allowed to go live with her sister in New Jersey and live her life there where she offended on the victim while living in both places."
And then there were the wigs.
"There was an ongoing issue in regards to her wigs coming into the facility.
. . . .
. . . . [T]here were times she was willing to comply with the staff indicating that she has to follow a process to get the wigs in. However, there was an incident. She was—prior to that, she was told she can only have one at a time. So, if another one is brought in to give to her, she's supposed to return the other one. So, they're supposed to be switching. She was only to have one wig in her possession. It came to the staff's attention that she had reached over the nurses' station and retrieved the other one, having two in her belongings.
Dr. Lo-Rhoden recalled that treatment notes about that "specific incident indicated her becoming emotionally dysregulated about not being able to have her wigs inside the facility, meaning that she was emotionally very distressed even though staff had spoken to her about how she can get the wigs in and the process for that."
Dr. Lo-Rhoden explained that she viewed the video-call incidents and the wig conflicts as related manifestations of boundary-testing and manipulation of staff directives.
"There was ongoing incidences [sic] with the wigs, even in terms of the way she communicated with one staff versus another, where she would say to one staff that it was allowed by another staff, indicating staff splitting in terms of what was the actual directions over these wigs.
. . . .
. . . . [I]t even goes back to the calls that she was having. The FaceTime calls that she was having that [respondent] indicated that one staff allowed it as long as the children weren't visible on the screen, kind of disregarding another's staff's direction or statement of this is policy [that] you're not allowed to have children on the calls.
So, there's back and forth that this staff said this, this was allowed, and then this staff says no. So, there's a lot of confusion that's happening over the wigs as well as these calls because of the staff splitting that she's engaging."
Dr. Lo-Rhoden acknowledged that, when young children's faces or voices appeared on the FaceTime calls, treatment staff could have terminated the calls or disciplined respondent for the violations. Yet, neither ever happened. Also, per Dr. Lo-Rhoden, respondent was never formally sanctioned or disciplined for any of the wig incidents, the last of which occurred in August 2024. Other minor rule infractions, such as unauthorized food and decorations in respondent's room, were punished minimally, if at all.
Dr. Lo-Rhoden testified, too, that respondent's dress while in STARC has been worrisome, as illustrated by March and July 2025 incidents
"of her dressing inside the facility, wearing shirts and only her underwear without any pants walking around in the unit. Also wearing a short nightgown with her back exposed [and] lower in the chest area a few times where her sports bra was showing. And, she was again educated on this—that is not appropriate in the unit, that she must button up or that she must wear pants. And, there seems to be this, just, lack of insight into her behaviors even after education.
. . . .
It's a sex offender treatment program. We have a whole bunch of different individuals with different sexual behaviors, sexual histories. And, this is a risk, one, for other residents but as well as Ms. H in terms of what—one, it just violates the policy. It violates certain boundaries and rules of clothing even in one's own community that you're supposed to be dressed appropriately. You wouldn't go out to the community—it just—again, it puts other people at risk."
When asked on direct examination, "When you look at all these different behaviors committed outside of the sex offender treatment class, what, if any, relevance do they have for you with regards to mental abnormality?," Dr. Lo-Rhoden replied,
"[P]art of the mental abnormality is that the—one, is the sexual behaviors—the illicit sexual behaviors specifically towards prepubescent children. And, we're looking at [how] this violates social norms and rules. And, if we're looking at it from that perspective and look at the person as a whole, we're also looking at, not only how she's functioning inside treatment, but also how she's living within her community. And this—how well she's doing inside the treatment room doesn't seem to be transferring out to her community.
These violations of the norms within the facility in terms of the way she's relating to staff and the rules, expecting for policies to not be followed, attempting to get staff to not follow certain policies and indicating that certain things should have to apply to her, such as decorating her living space the way she wanted to. It speaks to that—that kind of disregard for the rules and that it doesn't apply to her.
And, again, going back to, like, the inappropriate dressing, it's speaking, again, to the boundaries, violation of boundaries to herself, as well as to others, and how that's showing kind of that inappropriateness and that—So in terms of being able violate even the minor policies and minor rules, if she can't be expected to even follow the minor stuff, how will she function out in the community, out in society when she's told these are the rules, you are not to have contact with children, which we see that she violated the moment she started having contact with the qualifying sex offense victim."
The totality of these data points signals to Dr. Lo-Rhoden that respondent will have a difficult time controlling her pedophilic urges if released into the community for two main reasons. First, respondent's "pedophilic arousal is not going to change. As we see in terms of [her] offending pattern—that the first one occurring at age 20 and the last occurring at 35, 36. This is clearly within [her] adulthood and sexual arousal is not shifting." Second, "prior sanctions, prior completion of sex offender treatment, external controls such as parole supervision were insufficient to keep Ms. H from reoffending in a qualifying sex offense."
Dr. Lo-Rhoden emphasized that respondent reoffending in the Bronx, following her Pennsylvania convictions and incarceration, "was a big part of" her determination that respondent has a serious difficulty controlling her sex offending behavior.
"That the sanctions, the—despite treatment, despite completion of sex offender treatment—was another aspect of it that showed that there was such a predisposition, such a difficulty—serious difficulty controlling, that the reoffending is occurring despite, again, all the external controls that's been placed, and treatment [sic]. And, again, external controls, meaning specifically in that she was to register—she was following in terms of registering—but in the community was offending.
. . . .
I would say there's a higher likelihood of finding that serious difficulty component [of [*8]mental abnormality] when all of those things have been put in place and it still has not either protected the respondent from sexually reoffending [sic]. Yeah, I think there's a higher likelihood in that."
There was no substantive disagreement between the observations, diagnoses and professional conclusions of Dr. Lo-Rhoden and those of Dr. Katrina Colistra, the State's pre-trial psychiatric examiner. Dr. Colistra also "assigned the diagnosis of pedophilic disorder" to respondent and gave the same "attracted to male" and "nonexclusive type" specifiers. Dr. Colistra, like Dr. Lo-Rhoden, noted respondent's emotional congruence with children. Dr. Colistra testified that,
"as observed in the records, Ms. H had discussed feeling comfortable around them or wanting them to like her, suggesting an emotional connection to those children. . . . The psychological relevance of those statements tie to the pedophilic disorder. So, persons that suffer with that pedophilic disorder are more likely to have an emotional connection with children or to desire an emotional connection with children."
In discussing likelihood of reoffense, Dr. Colistra voiced a concern that respondent's New York "offen[se] after [the Pennsylvania] conviction or sanction suggests to me a stronger—an interest, a stronger interest in prepubescent children. . . . I utilized the word 'stronger' because, despite attempts at intervention, this behavior continued to exist and occur." In other words, as did Dr. Lo-Rhoden, Dr. Colistra, too, found significant that respondent "completed treatment, [which] suggests to me that she can learn the concepts and talk about those concepts and complete assignments. However, when it comes to integrating that into her behavior, that she is unable to do that."
Dr. Colistra noted, in line with Dr. Lo-Rhoden, that respondent engages in "distortion or minimization" when addressing her past sex crimes. Dr. Colistra did acknowledge on cross-examination that over the years respondent has been "increasing in acceptance. [But,] I wouldn't, at this point, use the [phrase] 'fully [accepted]'." Dr. Colistra also concurred with Dr. Lo-Rhoden's opinion that respondent's family members were not ideal support systems for her sex offender treatment or rehabilitation. The prospect of respondent returning to live with her mother concerned the doctor, "given that she was living with her [mother] . . . at the time of [the] prior offense." Moreover, like Dr. Lo-Rhoden, Dr. Colistra found significant that, with the latter conviction, respondent "was willing to risk a long-term friendship and freedom while living in that house [with the child victim and his family] to engage in that behavior."
Dr. Colistra's professional assessments concerning the question of serious difficulty controlling sex offending conduct were in alignment with Dr. Lo-Rhoden's. She, too, cited to respondent's "emotionally dysregulated" reactions over the "wigs in her possession" and having repeatedly worn inappropriate dress while housed in the current treatment facility as indicators of impaired impulse control. Respondent's sexual improprieties with consenting adult inmates in Pennsylvania demonstrate to both doctors, in the words of Dr. Colistra, a "difficulty or an inability to curb that sexual behavior, which to me indicates a lack or inability to learn interventions regarding her sexual interests." 
C. Respondent's Evidence
Respondent's psychiatric examiner, Dr. Joseph J. Plaud, reviewed the same documentary materials as the State's experts but, unlike them, also personally interviewed respondent on December 5, 2024, for a "couple of hours at least, I would think." Dr. Plaud concurred with the State's experts' diagnosis of pedophilic disorder, nonexclusive, sexually attracted to males. His [*9]disagreement was with the State's experts' joint conclusions that (1) the diagnosis was necessarily chronic and (2) respondent was currently exhibiting serious difficulty in controlling her pedophilic urges.
Respecting whether pedophilic disorder is chronic, the following cross-examination colloquy took place between the State and Dr. Plaud.
"[THE STATE]: And, as you have indicated already that you know that [the State's experts] both diagnosed respondent with pedophilic disorder?
[DR. PLAUD]: Right. I believe there was no disagreement amongst experts in this case diagnostically, correct.
[THE STATE]: And you agree with them that pedophilic disorder is a chronic lifelong condition?
[DR. PLAUD]: No, not the way you asked the question. It's more complicated than that.
[THE STATE]: Let me rephrase then. Is pedophilic disorder chronic and lifelong according to the DSM-5?
[DR. PLAUD]: In some cases it is. In others it isn't.
[THE STATE]: Does the DSM-5 give any indication about whether pedophilic disorder is chronic?
[DR. PLAUD]: There's a statement that's been carried forward that uses the term, if I recall specifically, it is oftentimes considered to be a chronic disorder, not invariably.
[THE STATE]: And you agree that today, respondent still has the diagnosis of pedophilic disorder?
[DR. PLAUD]: Yes, because there's no way to really un-diagnose it given the current clinical diagnostic criteria. There are with other paraphilias a change over time; not with pedophilic disorder. Although I will tell you the grip strength in my professional judgment of that disorder for Ms. H today, I do not believe that it is significant.
[THE STATE]: But, it's significant enough that you would diagnose her with pedophilic disorder today?
[DR. PLAUD]: I made the diagnosis based on history, and I'm trying to be very careful and actually conservative in my approach diagnostically. But, I do not think that characterizes Ms. H's current sexual—I don't want to say orientation, but it doesn't—it doesn't today in 2025 really characterize her.
[THE STATE]: When you wrote your report on February 8, 2025, you wrote that she has a diagnosis of pedophilic disorder, correct?
[DR. PLAUD]: Yeah, and if I rewrote it today, I would say the same thing. That's not my point. The point is that the grip strength of it—its controlling authority over her current sexual functioning behavior—I think is not significant today. But, there's really no way to undiagnosed such a disorder, even though other professionals over the years have questioned the validity of that clinical diagnosis."
In connecting his two overarching points of contention with the State's witnesses, Dr. Plaud testified,
"I would call the presence of a mental disorder such as pedophilic disorder [as] a necessary, but not sufficient, condition. In other words, the definition of a mental abnormality refers specifically to a congenital or acquired condition, disease or disorder, ok? Pedophilic disorder would qualify in this case. There's that part, right?
But it doesn't stop there. It keeps going, right? And, where it goes to, and really speaks [*10]to, is that that condition or conditions need to impact in real time and in the present time—because, this is about the person's current status— their emotional, cognitive or volitional capacity over their sexual behavior essentially, right?
No clinical diagnosis in and of itself directly speaks to a person's current volitional capacity, and that's not just with sexually based disorders. That's with every type of disorder—depressive disorders, anxiety disorders, you know, anything that a person can clinically meet the [sic] psychodiagnostics criteria of—doesn't necessarily bring with it a statement of—whether they can control that underlying condition. And, that's the key here. That's [ ] why I call it a necessary, but not sufficient, condition.
So, you have to really evaluate that second part, and in this case with Ms. H, in my judgment, that that part is clearly not met. That it is my professional determination she does have volitional control, volitional capacity over her sexual impulses and behavior in 2025. And, that's the key in which dismisses, in my judgment, the mental abnormality validity."
Respecting records and respondent's self-reporting about her childhhod, sexual abuse, sexual orientation, gender dysphoria, and the like, Dr. Plaud testified,
"I think for a significant period of time during her own psychosexual development, Ms. H was very confused about her own sexuality. She described herself as—is reflected, actually, in records that I reviewed—as not, as being considered to be odd or not particularly able to articulate what she thought her own sexual orientation was. That she initially thought she was gay and had difficulty expressing that. Later coming to understand that there were issues in transsexuality going on.
. . . .
That she had difficulty expressing herself in an appropriate manner earlier on in her life sexually—I think some of that . . . can credibly be traced to her own victimization."
Dr. Plaud opined that the wig and inappropriate-dress controversies were better understood in the context of respondent's decades-delayed psychosexual development, not as indicators of volitional impairment.
"I don't know how you would make whether she has one wig or two wigs significant to her volitional capacity over her sexual behavior. I own 1,000 bow ties so, you know, it's irrelevant. And, in so far as, you know, maybe showing her sports bra on occasion, it's not something that happens all the time where she is being written up for it. But, here is what I think. It does tell us, too, this kind of thing that she feels more confident about herself, right? Not timid, not afraid, not trying to hide in the shadows anymore."
Respecting the Pennsylvania summer camp sex offenses, Dr. Plaud testified that respondent fully admitted responsibility during the December 2024 interview. "So, there was no denial or what I could detect as extreme minimization of the—of her perpetration of the sexual abuse in that first offense," at a time when respondent was "about 20 years old" and "confused about her own sexuality." Contrary to the State's view of the Pennsylvania offenses as indicative of grooming and uncontrollable pedophilia, Dr. Plaud characterized respondent's 2003 crimes as "opportunistic given her position as a camp counselor."
Respecting respondent's Article 10-qualifying conviction, Dr. Plaud testified that,
"[a]gain, she admitted fully to committing the offense, noting that she took advantage the [sic] victim; that at that time she was rather careless in her approach to life in general, did not really consider or account for the consequences for either herself or the victim, and [*11]that she did not have appropriate empathy for the victim at the time."
Dr. Plaud gave little assessment value to the various examples of respondent's institutionally violative, consensual sex acts, "[g]iven the nature of them, no. And, the fact that the farther back you go in time, the less significant the data. . . . It does not affect her volitional capacity or her sexual behavior." Dr. Plaud explained that,
"demographically, it's a very high-frequency behavior across the broad spectrum of prisoners, right, to engage in sexual behavior. The question isn't whether they do it. Of course it's against the rules. That's why it's a disciplinary issue, okay? You're not supposed to do anything in prison for obvious reasons, but you have to look at the functional nature of it, right? What kind of sexual behavior? Is it consensual? In other words, if it was in the community and not in an incarcerated setting, would it be considered to be illegal or high-risk behavior. In this case, the answer clearly is no.
Second of all, I mean, the issue is this: if the sexual acts we know about from the first incarceration involved Ms. H herself forcing herself on someone, engaging in coercive sexual behavior, involving other paraphilias for example, then yes, that will be more of a consideration, right? But, we don't have this here in this case."
In Dr. Plaud's opinion, respondent does not presently exhibit emotional congruence with children. Importantly, too, Dr. Plaud added, respondent was not engaged in proxy behaviors with any of her consensual adult partners. Consequently, Dr. Plaud assigned minimal Article 10 evaluative worth in the appearance of young children's voices and faces during respondent's FaceTime visits with family members. "[I]f you have contact with family members, for example, using social media, . . . you know, chances are if the person has kids or there are kids in the neighborhood, you may encounter that. That's somewhat beyond your control, right?" However, Dr. Plaud continued, the presence of the young children and their voices did not diminish respondent's self control over her pedophilic disorder.
"Does then, like, the—the conversation then focus on the children? Right? Does the relative that you're talking to initially become insignificant in the conversation [due to the children's presence]? . . . Is the focus all about it [the children's presence]? Is there an increase in behaviors that may be difficult after the fact, after the contact, right? Where someone is acting a bit symptomatically or engaging in proxy behaviors institutionally? There's none of that. I look at that [the children's presence during video calls] as much ado about absolutely nothing."
Dr. Plaud found respondent's current age, 42 years, to be a significant indicator of a lesser likelihood to reoffend.
"You know, you see a trajectory. She's 42 years old now, and I think there is a maturation curve. I think she was very psychosexually delayed. Early in life, there is a lot of confusion both not only in her gender identity but also just in her ability to express herself sexually in a comfortable manner. And, I think that's what did orient her more towards younger people historically. I mean, when she's 20 years old, she has the prepubescent victims. Well, she's 42 now. I think that she now is comfortable in her identity, in her sexuality. I think it's dramatically different than it was when she was a much younger person. And, again, this is a current evaluation of her. It's not how was she in 2003. So, I see that there is a significant difference.
. . . .
I think early on, the first [offenses], as I mentioned earlier, she was 20 years old. I think [*12]she was incredibly sexually and socially immature. I don't think she knew which way was up sexually at the time. She was in a position of power in the sense of being a camp counselor, and I think she took advantage of that—not because she was driven to do it by a mental abnormality but because she made a bad choice in context of her own confusion.
. . . .
[S]he made a bad choice, okay? Then, a number of years goes by—we're talking, you know, over 15, 16 years goes by. She's in her mid-30s [ ] and, again, this isn't hang out [at] a school or a park, or having an unknown victim where you're acting because you're driven . . . to go to the places. It's a child of someone she knew for years, and [s]he made a bad decision. I don't think she even then fully grasped the negative consequences to the victim and to herself.
Well, that is not the case today in 2025. She understands her choices. She understands her mistakes. She takes responsibility for them. It's a dramatically different situation, and that's why she's not—does not have a mental abnormality today.
. . . .
. . . . [T]hrough[out] her life, in her 20s and into her 30s [ ] she continued to try to figure herself out—which way was up, who was she, what's right, what's wrong, what's accountable sexual behavior and what's not. [ ] [I]t's a process where she's 42 now, and I think, you know, that process is significantly qualitatively different than it was when she was younger."
Dr. Plaud reinforced that it was his professional opinion that respondent "does not have a mental abnormality. . . . she has the condition that I clinically diagnose, but [ ] it does not presently affect her emotional, cognitive or volitional capacity. . . . It is my judgment she does not at this time, in 2025, have serious difficulty in controlling her sexual conduct."
III. Factfinding and Evidentiary Weight Determinations
The court accepts as factual and accurate the record accounts of respondent's criminal offenses, her dates/times of incarceration, and her sex offender treatment in both Pennsylvania and New York. The court credits that respondent initially, and over at least a fairly significant period of time, denied culpability for her molestation of the second of the two summer camp victims and the Bronx victim. The court credits, too, that respondent does accept responsibility today for each of her three offenses. The court also accepts as factual and accurate the record accounts of respondent's violations of various institutional rules over the past approximately two decades.
The court credits the three experts' joint assignment to respondent of pedophilic disorder, nonexclusive, sexually attracted to males. The court also credits as fact that pedophilic disorder is a chronic condition and does not credit Dr. Plaud's attempt to minimize its permanence. Dr. Plaud maintained that pedophilic disorder is chronic only "because there's no way to really un-diagnose it given the current clinical diagnostic criteria" in the DSM-5. There being "no way to really un-diagnose" the condition, however, is a central indicator of its "chronic" nature. Thus, Dr. Plaud's point collapses under the weight of circular reasoning, namely, faulting the DSM-5 for saying what he concedes it says. 
Dr. Plaud emphasized in his testimony, correctly, that an Article 10 trial concerns respondent's current mental state (see State v Anthony R., 228 AD3d 541, 544 [2024] ["petitioner must show that respondent is presently unable to control his sexual conduct"] [internal quotation marks omitted]). The court thus accords no appreciable evidentiary weight to Dr. Plaud's two-[*13]hour interview with respondent almost a year ago against the cumulative weight of the relevant law enforcement, court, penitentiary, psychological and sex offender treatment records, spanning two states and over two decades, that were made available to both parties.
The court accords little evidentiary weight to respondent's various non-sexual violations of institutional rules (e.g. unauthorized wigs, decorations, food and the voices of relative children on FaceTime video calls with family). The State's experts interpreted these cumulative violations through the prism of respondent connivingly using staff splitting to fulfill her personal desires rather than controlling herself and following the institutional rules. The court agrees with the State's witnesses that respondent is intelligent and has utilized manipulation to get her way. That being said, the court views these violations differently.
It is unremarkable that, when institutional rules are unevenly enforced, the governed tend to gravitate toward the more lax enforcers thereof. Both of the State's experts find fault wholly with respondent for not strictly following the institutional rules which, they say, is necessary for her progression in sex offender treatment and for her reintegration into society. Yet, the State's experts express zero concern about how uneven institutional enforcement contributed to respondent's compliance issues. Institutional responses to respondent's repeated violations rarely went beyond her being "educated" and told to not do it again. FaceTime calls with family were not cut off or disallowed. Wigs were not banned. In short, sex offender treatment experts—like those employed at STARC—have not demonstrated any real concern over respondent's smorgasbord of non-sexual violations. The State's attempt to sound the alarm now is simply not persuasive.
That respondent has on multiple occasions succumbed to her libido instead of adhering to strict prison and treatment bans on sexual conduct is not particularly surprising—certainly no more surprising than each of respondent's adult partners also having succumbed to their libidos instead of adhering to the same ban. Sexual disciplinary infractions from approximately 15 years ago involving consensual sexual activity with age-appropriate men does not, contrary to the State's point of view, carry any significant weight in the court's analysis of whether respondent currently suffers from a mental abnormality under Article 10. The evidence of respondent's consensual relationship with another treatment patient more than a decade ago is of similarly miniscule import. Consensual adult sexual conduct, while rule-breaking, is far from uncommon in correctional and treatment environments and does not, without more, clearly and convincingly evince an inability by respondent to control specifically her pedophilic impulses.
The court credits and accords significant weight to the uncontroverted evidence, highlighted by Dr. Plaud, that respondent's sexual contacts while imprisoned and in treatment were with age-appropriate, consenting men who also do not appear to have been groomed or to have served as proxies to satisfy a pedophilic desire. Nothing in the record suggests, for example, that respondent selected only particularly young-appearing, short, or juvenile-acting men; attempted to juvenilize her partners; or created new adult relationships specifically to gain access to minors in their lives. The absence of grooming or proxy behaviors supports Dr. Plaud's concurrent opinions that (1) respondent does not actively seek out victims and (2) respondent's prior sex offenses were opportunistic rather than the result of serious advance planning or grooming (see State v Donald DD., 24 NY3d 172, 188 [2014] ["[O]ne who committed a rape soon after serving a very lengthy sentence may not have serious difficulty controlling his sexual urges. Rather, the rape may be a crime of opportunity, and the defendant willing to risk the prospect of a return to incarceration"]).
IV. Article 10 "Mental Abnormality" Analysis
In an Article 10 trial the factfinder "shall determine by clear and convincing evidence whether the respondent is a detained sex offender who suffers from a mental abnormality. The burden of proof shall be on the attorney general" (Mental Hygiene Law § 10.07 [d]). Preliminarily, the court finds as undisputed that respondent is a detained sex offender.
The next question is whether the State has demonstrated by clear and convincing evidence that respondent suffers from a mental abnormality, i.e. whether respondent has "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (Mental Hygiene Law § 10.03 [i]). The court finds that respondent's chronic pedophilic disorder is "a congenital or acquired condition, disease or disorder . . . that predisposes . . . her to the commission of conduct constituting a sex offense" (id.).
The final remaining question is whether the State has proven by clear and convincing evidence that respondent's pedophilic disorder "results in [her] having serious difficulty in controlling such [sex offending] conduct" (id.). In support of its position that respondent has serious difficulty controlling her pedophilic disorder, the State effectively put forth the following logical argument during trial.
Premise 1: Factual evidence over a span of decades demonstrates that respondent has difficulty controlling her libido;
AND
Premise 2: Respondent had, and will always have, chronic pedophilic disorder every time that she has exhibited, or will exhibit, difficulty controlling her libido.
THEREFORE,
Conclusion: Respondent's pedophilic disorder is the specific cause of her difficulty controlling her libido.
Assuming premise 1 to be true, arguendo, and having found true premise 2, the court rejects the State's conclusion as a logical fallacy of post hoc ergo propter hoc ("after this, therefore because of this"). The State assumes a causal link from respondent's pedophilic disorder to her purported difficulty controlling her libido generally, but presents no clear and convincing evidence thereof (see State v Kenneth II., 190 AD3d 33, 39-40 [2020] ["Regarding the control element, the petitioner must demonstrate that a respondent has a serious difficulty controlling his or her sex-offending conduct that is independent from the fact that a diagnosis generally predisposes an individual to commit conduct constituting a sex offense"]).
The court declines to view a respondent's perceived difficulty controlling their libido in general as evidence specifically of a mental abnormality absent clear and convincing evidence that the difficulty is in fact caused by the condition that "predisposes him or her to the commission of conduct constituting a sex offense" (Mental Hygiene Law § 10.03 [i]; see Donald DD., 24 NY3d at 88 ["Undoubtedly, sex offenders in general are not notable for their self-control. They are also, in general, not highly risk averse. But, beyond these truisms, it is rarely if ever possible to say, from the facts of a sex offense alone, whether the offender had great difficulty in controlling his urges or simply decided to gratify them, though he knew he was running a significant risk of arrest and imprisonment"]). To whatever degree the trial evidence may demonstrate that respondent has difficulty in controlling her general libido—and the court issues no opinion on this point—the court finds that the State has not demonstrated by clear and [*14]convincing evidence that respondent has a serious difficulty in controlling specifically her pedophilic "disposition" (State v Frank P., 126 AD3d 150, 163 [2015] ["As Donald DD. recognized, the concept of predisposition and volition are separate and distinct. A disorder like Paraphilia NOS might predispose someone to the commission of sexual offenses, but the offender might have enough degree of control over the disposition"]).
V. Verdict
For all of these reasons, the court finds that, against the burden of clear and convincing evidence, the trial evidence is "insufficient to support . . . [a] finding that respondent had such an inability to control [her] behavior that [she] was likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility" (State v Michael M., 24 NY3d 649, 660 [2014]). Therefore, the court's VERDICT is that the State has not proven by clear and convincing evidence that respondent, Kirby H., currently suffers from a mental abnormality. Accordingly, the Article 10 Petition is ORDERED DISMISSED(see Mental Hygiene Law § 10.07 [e]). The court STAYS SEALING of this matter for 30 days from the date of this decision and order.
THIS CONSTITUTES THE DECISION AND ORDER OF THE COURT. 
Dated: November 10, 2025
Bronx, New York
E. Deronn Bowen, A.J.S.C.

Footnotes

Footnote 1:Respondent has lived as a transgender woman since 2021. All of her criminal sex offenses occurred prior thereto, when she identified and lived as a cisgender man.

Footnote 2:See ante n 1.